# RECORD NUMBER:

============================================================

## IN THE UNITED STATES DISTRICT COURT FOR
## FOR THE DISTRICT OF COLUMBIA

### ZHENLI YE GON
### Petitioner

### v.

### Loretta Lynch, the Attorney General of
### The United States, the U.S. Department of Justice

### John Kerry, The Secretary of State
### The U.S. Department of State

### Respondents

## <u>AMENDED PETITION FOR WRIT OF ERROR CORAM NOBIS</u>

Ning Ye，Esq.
Law Office of Ning Ye, Esq.
For the Petitioner
3626A Union Street, Suite 3F
Flushing, NY 11354
Tel.(718)308-6626

Fax：（718）228-5816
Email: ynyale@aol.com

Valinda Jones. Esq., et al
Counsels for the Respondents
U.S. Department of Justice
Office of International Affairs
1301 New York Avenue, NW
Bond Building
Washington, DC 20530
Tel.: (202）616-5193
Fax: (202) 514-6112

## <u>Table of Contents</u>

Page Number:

1. Brief Statement of the Case     6

2. Newly Discovered Evidecne In Overturning The Grounds Of "Probable     16
   Cause" Finding In Support Of The Underlying Certificate Of Extraditability

3. Petitioner's Pending Asylum Case With The Us Immigration Court At Arlington,
   VA May Beed To Be Considered By This Hon. Court Before Affirming
   Extraditability     18

4. Likelihood of Success in One or More Pending Matters to Support Motion
   to Stay: District Court's Denial of Habeas Relief to Allow Extradition
   Should be Reversed As Error Corum Nobis Petition and Other Petitions     19

5. Mexican Government's Request for Extradition Should be Rejected for
   Violation of Article 3 of U.S. – Mexico Treaty of Extradition     24

6. Due Process under 5th Amendment violations in denying the Petitioner a "full,
   fair and meaningful hearing" on "sufficiency of evidence" as well as gross and
   total violations of Article 3 of the U.S.-Mexico bilateral Extradition Treaty;     31

7. Intervening Circumstances caused by Incompetent Counsels' "Assistance"
   Deprived Petitioner's Procedural Safeguards under 5th Amendment, as in
   Violation of 6th Amendment Found in Mexican Authority's Tampering
   Evidence, Obstruct of Justice     32

8. Subject to Article 3 of the UN Torture Convention, as well as Section 241(a)
   of the INA, Petitioner should not be Extradited into Mexico, Even Assuming
   His Eligibility for Asylum was Denied with Exhaustion of Procedures     36

9. The Request for Extradition is Moot Regarding Requesting Party's Redress     37

10. Legal Analysis for Writ of Error Coram Nobis     38

11. Relief Prayed     40

12. Certificate of Service     42

**TABLE OF AUTHORITIES**

Page Number:

Padilla v. Kentucky 130 S. Ct. 1473 (2010)    5,13, 29

U.S.A. v. **Akinsade,** 686 F.3d 248, **4th Cir,** 2012    5, 29

HUDAVERDYAN V. HOLDER 9th Cir. 2015    9

Singh v. Holder, 9th Cir. 2014    13

*Baghdasaryan v. Holder*, 592 F.3d 1018 1023 (9th Cir. 2010)    13

*Rosado v. Civiletti*, 621 F.2d 1179, 1195-96 (2d Cir. 1980)    15

Cf. *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, (1952)    15

*In re Extradition of Burt*, 737 F.2d 1477, 1486-87 (7th Cir.1984)    15

Plaster v. United States, 720 F.2d 340, 348, 354 (4th Cir.1983)    15

*United States ex rel. Bloomfield v. Gengler*, 507 F.2d 925, 928 (2d Cir.1974)    15

European Human Rights Court's Decision on Armand v Home Secretary
and Minister of Defence of Royal Netherlands Government [1943]    21

 M-A-M-, 25 I & N Dec. 474 (BIA 2011)    24, 25

*Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976);  24, 24

*Yamataya v. Fisher* 189 U.S. 86, 100-01, 23 S.Ct. 611, 47 L.Ed. 721(1903)    24

*Gandarillas-Zambrana v. BIA,* 44 F.3d 1251, 1255 (4th Cir.1995).    24

*Mathews v. Eldridge,* 424 U.S. 319, 333,96 S.Ct.893,47L.Ed.2d18 (1976)    24

  *Jacinto,* 208 F.3d at 727; *Campos-Sanchez,* 164 F.3d at 450;    24

*cf. Landon v. Plasencia,* 459 U.S. at 36, 103 S.Ct. 321 74 L.Ed.2d 21 (1982)    24

*Gandarillas-Zambrana,* 44 F.3d 1251, 1257 (4th Cir.1995)    24, 25

Blockgurg v. United States, 284 U.S. 299    26

Brown v. Ohio, 432 US 161 (1977)    **26**

21 U.S.C. § 802(34)(K) and 21 C.F.R. § 1310.02(a)(11)    **27**

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct2052, 80 L.Ed.2d 674 (1984)29

*Societe Nationale Industrielle Aerospatiale v. United States District Court, S.D.
Iowa,* 482 U.S. 522, 554, 107 S.Ct. 2542, 2550, 96 L.Ed.2d 461 (1987)    31

Henkin:Rights:American and Human, 79 Colum.L.Rev. 405, 411 (1979)    **31**

*Barr v. United States Dep't of Justice*, 819 F.2d 25, 27 (2d Cir.1987)    **31**

*Reid v. Covert*, 354 U.S. 1, 16-18, 77 S.Ct. 1222, 211 L.Ed.2d 1148 (1957)    31

*Neely v. Henkel*, 180 U.S. 109, 122, 21 S.Ct. 302, 306, 45 L.Ed. 448 (1901).    32

*Rosado v. Civiletti*, 621 F.2d 1179, 1195-96 (2d Cir.)    32

Cf. *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).    32

*Jhirad, 536 F.2d at 48*    **35**

*Gallina v. Fraser, 278 F.2d 77, 79 (2d Cir.),*    **35**

*In re Extradition of Burt, 737 F.2d 1477, 1486-87 (7th Cir.1984)*    36, 37

*Plaster v. United States, 720 F.2d 340, 348, 354 (4th Cir.1983)*    **36**

*United States ex rel. Bloomfield v. Gengler, 507 F.2d 925, 928 (2d Cir.1974)*    **36**

Cf. *Demjanjuk v. Petrovsky*, 776 F.2d 571, 582 (6th Cir.1985),    36,37

*Paquete Habana,* 175 U.S. 677, 712, 20 S.Ct. 290, 304, 44 L.Ed. 320 (1900)).    36

Plaster v. United States, 720 F.2d 340, 348, 354 (4th Cir.1983)    37

United States ex rel. Bloomfield v. Gengler, 507 F.2d 925, 928 (2d Cir.1974),    37

United States v. Bazuaye, 2010 WL 4366456, *1 (4th Cir. Oct. 28, 2010) (citing

28 U.S.C. § 1651)                                                                                    38
Carlisle v. United States, 517 U.S. 416, 429 (1996))                                  39
 United States v. Morgan, 346 U.S. 507 (1954)                                        39
28 U.S.C. § 2255                                                                                     39
614 of USDOJ Manual: Procedures in the US district Court)                     39
United States v. Balistrieri, 606 F.2d 221, 216, 219 (7th Cir. 1979)           39
Trenkler v. United States, 536 F.3d 85 (1st Cir. 2008)                             39
United States v. Johnson, 237 F.3d 751 (6th Cir. 2001)                           39
Kwan, 407 F.3d at 1014                                                                         40
United States v. Castro, 26 F.3d 557, 559 (5th Cir.1994) (same)               40
In United States v. Akinsade, 686 F.3d 248, 4th Cir, 2012                       40
United States v. Denedo, 129 S.Ct. at 2220                                            40
United States v. Mandel, 862 F.2d 1067, 1075 (4th Cir.1988).Mandel, 862 F.2d at
1074–75."                                                                                             40
O'Dell v. Netherland, 95 F.3d 1214 (4th Cir.1996) (en banc).                   40

**Statutes, Rules, International Treaties, and Scholars' Treatises**

28 U.S.C. 1651(a) and  （b）                                                             5
18 U.S.C. § 3231 Under the "All Writs Act"                                           6
Rule 59/Rule 60 Fed R. Civ. Proc.                                                        6
Article 3 of the U.S. –Mexico Treaty on Extradition.                               6
Due Process under the 5th Amendment                                                19
Geneva Protocol addressing Refugee Status                                         19
Article 208 of U.S. Immigration and Nationality Act                          19-20
Article 5 of the U.S.-Mexico Extradition Treaty                                    20
Article 3 of UN Torture Convention Treaty,                                          20
Article 6 Non bis in idem. U.S. –Mexico Extradition Treaty                    20
Geneva Protocol on Refugee Status,                                                    20
U.S. Immigration and Nationality Act                                                  20
Art. 5 of the U.S. – Mexico Extradition Treaty.                                     20
AC 147; and section 9(2) of and paragraph 6(1) of Schedule I to the 1989 Act.   21
Article 33 of the 1951 Convention on Status of Refugees                       21
Article 5 of the U.S. – Mexico Treaty on Extradition, 12 Article 33 of the 1951   21
Geneva Convention adopted by 1967 Geneva Protocol on Refugee Status        23
Article 3 of the UN Torture Convention (CAT)                                      23
Sec. 208(a) of the INA or 8 USC 1158                                              **23**
241(b)(3) of the *Immigration and Nationality Act*                             23
Article 5 of the Extradition Treaty                                                      23
L. Henkin, R. Pugh, O. Schachter & H. Smit, International Law:
Cases and Materials 184-85 (2d ed. 1987).                                         32
Cf. L. Henkin, Foreign Affairs and the Constitution 255 (1972)              32
United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading
Treatment or Punishment art. 3, GAOR A/39/506 (1984) 23 I.L.M. 1027, 1028 (1984)   35

**THE UNITED STATES DISTRICT COURT, DISTRICT OF COLUMBIA**

| | |
|---|---|
| Zhenli Ye Gon, Petitioner | ) Docket # : |
| v. | ) Petition for Writ of Errors |
| Loretta Lynch The Attorney General | ) Coram Norbis |
| John Kerry, the Secretary of State | ) 28 U.S.C. 1651(a); 18 U.S.C. |
| Respondents_____ | ) § 3231 under "All Writs Act" |

## Amended Petition for Writ of Errors Coram Nobis (Under Seal)

Comes now, the Petitioner, by and through his undersigned counsel Ning Ye, Esq. to respectfully pray to this Hon. Court for Writ of Errors Coram Nobis.   Pursuant to 28 U.S.C. 1651(a) and   (b)  18 U.S.C. § 3231 Under the "All Writs Act", Petitioner Zhenli Ye Gon ("Petitioner" or "Mr. Ye Gon") hereby petitions and moves for a writ *of error coram nobis* to vacate this Honorable Court's decision which certified the extradition sought by Mexico government on February 9, 2012 (Case 08-596) in connection to case 07-181*, involving triggering matters in case 08-596. This Petition for Writ is respectfully filed in order to correct fatal errors of the "most fundamental character" and prevent a manifested injustice/irreparable harm highly likely leading to life threatening, irreparable injustice from occurring.

The Magistrate Judge, the Hon. John M. Facciola's Certificate of Extraditability and Commitment Order rendered on February 9, 2011 may need to be reversed, vacated and/or set aside for fatal mistakes in the wake of newly discovered rebuttal evidence addressing the critical issues at the heart of the underlying case disputing Judge Facciola's finding of probable cause. Petition should therefore be granted. On August 28, 2009, the Hon. Emmet Sullivan, the U.S. District Judge dismissed narcotic drug related prosecution against Ye Gon with prejudice under Rule 48(a). There was no memorandum opinions with it. In related hearings, Judge Sullivan condemned violations of Brady rule, among others. He also condemned Mexican authorities' failure to provide key evidence in support of its charges. Unfortunately, these findings were not reduced into a memorandum opinion, to close the door for the evidentiary frivolity to be utilized such amplified magnitude in later extradition proceedings. Judge Sullivan also ordered release and return of seized/forfeited assets back to Defendant in "drug-related" criminal case 07-181, again, missing is a clear cut court's memorandum addressing reasons for such a disposition. Ye Gon's "drug" related charges in the United States was adjudicated under constitutional safeguards, that offered him a unique platform to have drug related charges cleared, showcasing how bad was Mexican government's frivolity by *falsifying every and all critical evidence* in triggering matters at 1st place to fool its own people, as well as the U.S. judicial system. Given to Mexico's abuses of this magnitude, the top priority should be given to protect Mr. Ye Gon's **"paramount interests",** to keep him here in the United States, thus avoid being exposed to Mexican Authorities' evidently life threatening injustice in violation of all prosecutorial ethics. (See *infra)*. That interest is much *senior* to his *penal interests* in case 07-181. Ye Gon's then counsels, Manny Retureta, Esq. and Eduardo Balarezo, Esq. had failed to spot, much less to defend, Ye Gon's "paramount interests", neither had they ever fully studied case file. Their failure, among other more appalling and shocking misdeeds, to be discussed *infra*, may have highlighted as "incompetent counsel" triggering reversal in light of Padilla v. Kentucky 130 S. Ct. 1473 (2010). This Petition for Writ of Errors may need to be granted in light of U.S.A.

v. **Akinsade,** 686 F.3d 248, **4th Cir,** 2012 adopting *Padilla* in Coram Nobis Petition.
*\***Though being dismissed, criminal case 07-181 may also need to be reopended.**
<u>1. Brief Statement of the Case</u>

On September 15, 2008, the United States filed a complaint in the United States District Court for the District of Columbia ("D.D.C.") seeking petitioner's extradition to Mexico on charges related to organized crime, drug trafficking, firearms, and money laundering. *Ye Gon v. Holt*, 774 F.3d 207, 212 (4th Cir. 2014), upon the Request for Extradition initiated by Mexican government, based upon prosecuting evidence of exculpatory nature, if any.   Before the Extradition case was brought to the U.S. District Court for the District of Columbia in September 2008, a criminal prosecution for drug related charge in a grand jury indictment was brought to the United States District Court for the District of Columbia ("D.D.C.") bearing case number 07-181, starting July 2007. That case was dismissed with prejudice by the Hon. Emmet Sullivan, the presiding U.S. District Judge on or about August 28, 2009 for Brady Violations and what Judge Sullivan held for Mexican government's failure to provide critical evidence in support of the case. Shortly after the Dismissal, Judge Sullivan ordered release of Defendant's all seized and forfeited assets and properties, once seized by the DOJ as suspiciously "drug proceeds".

In addition to more severe errors and mistakes as being pin-pointed *infra* in this Petition for Writ, the Magistrate Judge, the Hon. John M. Facciola's Certificate of Extraditability rendered on February 9, 2011 must be reversed, revoked. Mexican government's Request for Extradition of "El Chino", the subject, with confusing racial slur, needs to be rejected with or without prejudice, for at least deleting and cleansing such two lead charges concerning all narcotic drug related offense charges and charges of *money laundering*, in order to maintain integrity and uniformity of administration of justice of the United States, in the wake of judicial disposition of both the U.S. criminal prosecution and of seizures and forfeitures, manifested in the US District Court for the District of Columbia in case 07-181.

Application and interpretation of Evidence in support of Extradition was based upon Article 3 of the U.S. Mexico Extradition Treaty.
Article 3 of that Treaty provides:
"Extradition shall be granted only if the evidence be found sufficient, *according to the laws of the requested Party*, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place or *to prove that he is the person* convicted by the courts of the requesting Party."

In the underlying extradition case, the United States is what the Treaty provided, the "Requested party". On the other hand, Mexico is the "requesting country".   If Article 3 were dutifully followed, the Extradition enters into the deadlock and should have long been properly denied, for operation of the law of the Requested country, the Law of the United States.   The law of the United State which should be examined and adopted in

adjudicating the Extradition Request certainly include such supreme law of the land: The Constitution of the United States, case laws reflecting such Constitutional Safeguards as due process, 5th and 6th Amendment; Law governing evidence; procedural due process and regarding of the law, including judge-made law of, barring frauds and frivolity, self-incrimination; qualified immunity and of correctional mechanism.   Additionally, Ye Gon argued that the entirety of the Mexican authority's fabrication of such a huge bubble of "Drug Kingpin" case without illegal drug is Mexicans' disguised expropriation move in violation of international law because he had built up a largest pharmaceutical plant throughout Latin America, causing panic from the local powerful establishment.

Approximately two years before Magistrate Judge Facciola found "probable cause" and certified the Request for Extradition, an intervening circumstances, which should have fundamentally changed the normal course of then on-going extradition, occurred. On October 23, 2009, a very unusual intervening event happened, that had apparently exerted undue influence upon Judge Facciola's final disposition.   Records has been cleansed to eraze any clues of such an extraordinary occurrence of the tremendous miscarriage of justice. It appears all the participating parties carefully tip-toed the fine line, to avoid touching the issue to which everyone involved in this underlying case pretended to have been innocently ignorant except for the summit authorities of Mexican Law Enforcement.

On October 23, 2009, the Associated Press (AP), followed with almost all major media world over, publicized a shocking break-through, apparently based upon Mexican Deputy Attorney General Leopoldo Velarde Ortiz's press release, forming the Mexican Authority's new version of narcotic drug charge against Ye Gon:
The following is the AP's report on alleged Ye Gon's "confession", if any: Ye Gon "*told U.S. Prosecutors* he (Ye Gon—added)   **has sold *tons* of a chemical used to make methamphetamine on black market**," "a top Mexican official told the Associated Press" (AP Exclusive: "$205M Man says he sold meth chemical" AP, 10/23/2009, emphasis added)

The worldly circulated breaking news continues: The Mexican prosecutor general's office through its Deputy Attorney General Leopoldo Velarde Ortiz was publicizing its accusation through out the world claiming U.S. Law enforcement quoting Ye Gon's *"admission"* of *"selling" "tons of"" methamphetamine precursors* on the *black market*" (See AP News dated 10/23/2009, As Exhibit #6, emphasis added) .   That Deputy Attorney General *attributed* their receipt of such new Mexican version of drug charges against Ye Gon in forming the evidentiary basis for extradition proceedings, to the *leaks made by U.S. prosecutors* from the U.S. Department of Justice, with whom, Mr. Ye Gon had allegedly had "*interviews*", according to Deputy Attorney General Velarde. During such interviews, AP continued: "he (Ye Gon) *admitted his responsibility in the commission of the crimes he was accused of*", said Velarde in his news release with the Associated Press. Though Mr.

Velarde said that the U.S. attorneys had "not yet provided transcripts of the *conversation* or specifics of Ye Gon's account" to the Mexican law enforxcement yet, Mr. Velarde declared to the Press that **"Mexican prosecutors are hoping Ye Gon's conversations with U.S. prosecutors can be used as evidence in Mexico."** (AP Exclusive: Exhibit 6, page 2, Emphasis added)   In response to such a public announcement, the U.S. Department of Justice has completely failed to deny or dispute its veracity. The spokesperson for the U.S. DOJ, Ms. Sweeny said the DOJ had no comments, according to AP. (AP Exclusive: Exhibit 6, p2, Emphasis added)

What Mexican Deputy Attorney General attributed what he publicly announced Ye Gon's "interviews", "telling", "conversations" and "admissions" regarding his allegedly "selling tons of chemicals on the black market to be used to manufacture methamphetamine" to the leaks by U.S. Department of Justice that occurred certain period prior to October 23, 2009. Checking the time sequence, such a cited USDOJ's "leaks" of Ye Gon's "interviews" and "admission" and the underlying story of the leaks, true or false, occurred during the period while Mr. Manny Retureta and Mr. Eduardo Balarezo, who were later terminated by Mr. Ye Gon for cause, were Mr. Ye Gon's criminal defense counsels. Though these former counsels did not admit the truth of Mexican Deputy Attorney General's Publicity, blaming Mexican authorities attempted to "try the case in the media." (Nice as they so stated as they actually did, we don't see any necessity for those two to help the prosecutors on either side for such quoted "interviews" and "admissions" during the period between that duet's entry into the case under complicated circumstances and such date as to October 23, 2009, because if that duet had ever sit down to have patiently read the case file, that they would never have done to get themselves involved in Mr. Velarde's story, because they would have understood that the Mexico initiated drug case had already fallen into pieces, evidence wise, before they had jumped into the case. This undersigned wish they had not had to do anything to frame their real identity and their real roles in the story being told by Mr. Velarde.   Moreover, that duet had never put such Mexican new version of prosecution on the table to fight against, having pretended to have neglected the harmful consequences of such a worldly circulated official public announcement regarding Mr. Ye Gon's drug related "criminal offences" of Mexican Top Authorities' brand new version attempting to frame up the extradition proceeding's end-results.

Mexican government's 10/23/2009 public announcement can be summed up in the following four points:
1. There were "interviews" b/t Mr. Ye Gon and U.S. Department of Justice;
2. Mr. Ye Gon "admitted" that he sold tons of chemicals being used to manufacture methamphetamine on black market during the interviews;
3. The United States Department of Justice "informally" leaked the information of such "Interviews" and Ye Gon's "admissions" to the Mexican government;

4. Mexican government would use Mr. Ye Gon's admission allegedly made to the U.S. D.O.J. during the alleged "interviews" as incriminating evidence against Mr. Ye Gon in Mexican criminal prosecutions.

True or false regarding the contents of Mr. Velarde's 10/23/2009 globally circulated public announcement may not be this significant, because Mexican top authorities have explicitly expressed "**Mexican prosecutors are hoping Ye Gon's conversations with U.S. prosecutors can be used as evidence in Mexico."**   We are not here to investigate whether such Mexican top government authorities' public announcement was true or not, neither shall we examine what roles did Mr. Retureta and Mr. Balarezo's exactly played in what Mexican government publicly quoted as "interviews", "conversations" and "admissions" followed with alleged "leaks" made by the U.S. Department of Justice, that is now pushing for Judge Facciola Certified extradition, we must take such an alleged "interview", such an alleged "admission" as true, *as if* it had occurred *for the sake of argument and of possible relief purpose*, therefore it must be presumed to have happened. Because no matter what, the Mexican Government has declared to the world it would use such admission and interviews to prosecute Mr. Ye Gon once he was turned to the hands of Mexicans. Judge Facciola, while handing down his ax of Certification of Extradition, had completely failed to consider the Mexican Authorities "imputed opinion" and its harmful consequences not only threatens life of Mr. Ye Gon, but jeopardize the integrity of this nation's constitutional institution.    (The "Imputed opinion" doctrine is applicable here: "Petitioner was persecuted on account of an *imputed* political opinion, that is, because military police officials *thought* that *he was talking to the reporter* in an attempt to expose government corruption. That failure is an error of law." HUDAVERDYAN V. HOLDER 9th Cir. 2015. Here in this case, Ye Gon would be prosecuted in Mexico because Mexican authorities *thought* that *he was talking* to the USDOJ that he sold tons of meth precursor in Mexican black market.*)*

Assuming *arguendo* what Mexican Deputy Attorney General alleged interviews and admissions of drug offenses were true, (whether the allegation were true, Mexican persecutor has claimed that it would take it as true.) Applying the law of the United States under 5th Amendment, such alleged "interviews" with the USDOJ should presumably be undertaken by Mr. Ye Gon's voluntary cooperation, because our nation's 5th Amendment bans compelling a criminal defendant to appear in such an "interview" and to make "incriminating" confession or admission under coercion. What does it mean? It means even if the Deputy Attorney General's public announcement to the media were true that Mr. Ye Gon admitted that he had sold tons of narcotic drugs on black market, his admission of the fact in his interviews with the USDOJ prosecutors would have been protected by qualified immunity agreement, and such incriminating "admissions", if any, could not be used as inculpatory evidence in prosecuting and trial of Mr. Ye Gon, because the constitutional safeguard of our nation

under the 5th Amendment. *This presumption is intact assuming there is no intruders.* According to Article 3 of the Treaty, sufficiency of evidence in support of the extradition's underlying offense, should be determined by the law of the requested country, i.e., the law of the United States. That is to say, the sufficiency of the evidence of the offense, here, mostly narcotic drug offenses, should not be determined by the law of Requesting country, say, the law of Mexico. With such quoted "leaks" from the U.S. Department of Justice followed with Mexican government's publicly announced vows to use/misuse such leaked "evidence" to prosecute Ye Gon according to the law of Mexico, that is not covered by the constitutional safeguard of 5th Amendment of the U.S. Constitution, Judge Facciola should have instantly denied Mexico's extradition bid, or at least subpoena Mr. Velarde for testimony and clarification, for the purpose to ascertain, whether Mexican government's public announcement was factual truth and on what basis, if so, whether it would attempt to honor its public announcement should Mr. Ye Gon be extradited, i.e., to tramp upon the U.S. Constitution, particularly 5th Amendment.    As a Federal judicial officer, Magistrate Judge Facciola, has sacred duty to honor his oath in taking the office to dutifully protect the integrity of the U.S. Constitution and laws. As a citizen of the United States on the highest grounds of federal judicial system, Judge Facciola has the loyalty and vigilance defending the sovereignty of this nation, not to allow any intruders to take indecent foreign penal advantage by overwriting our 5th Amendment and rewriting Article 3 of the Treaty unilaterally.    When Article 3 provides the "law of the requested country" governs issues of evidence, such a law is certainly not the prosecutorial codes of Mexico in this instant case. Such a law of "the requested party" certainly include the U.S. Constitution, the supreme law of land, whose integrity should not allow such persons as Mr. Velarde, and/or Mr. Retureta, to tramp upon and mess up.    The law of the United States barred such *"interviews" and/or "admissions" of criminal offenses, if ture and assuming arguendo to be true,* to be admitted into prosecutorial evidence, while the Mexican authorities showed no respect on it. Doing so, Mexico *has forfeited* its bid for extraditing Ye Gon. Article 3 of the Treaty mandates the requesting party, i.e., Mexico, to fully respect the law of the requested party, i.e., the United States, Mr. Velarde's abrupt announcement shows its disrespect of the Constitution and law of the United States. Article 3 was thus violated at its fullest degree. Extradition should then be dismissed. While Mexican Authorities boldly pronounced that it would not allow the outreach of such 5th Amendment safeguard to the territory of Mexico in this instant case, its extradition bid **is over**. Judge Facciola should have immediately throw out the Extradition bid right after Mr. Velarde declared that: "**Mexican prosecutors are hoping Ye Gon's conversations with U.S. prosecutors can be used as evidence in Mexico.**" Or alternatively, he should at least order to investigate such serious contempt from Mexican authority, apparently in derailing the track of our nation's constitutional system.

Again, assuming Mr. Velarde's 10/23/2009 public announcement is true, while it must be assumed to be true for the sake of argument, because Mexico authority vowed it would take it to be true in prosecuting Ye Gon in their country, the question is whether U.S. Department of Justice should have foreseen such a prospect that "interviews", "conversations", and "admissions" made therein, if getting Mexican authorities messed up in the process or sharing such confidential information with the USDOJ, would definitely lead to such consequences as Mexican government's "violation" of the U.S. 5th Amendment, against which, Mexican top authorities had made it clear to the world it would not allow such extraterritorial coverage of the U.S. Constitution, particularly its 5th Amendment over the land of Mexico.

At this critical juncture in a nation under the rule of law, the U.S. Department of Justice may only have two wise, legitimate and *decent* choices: 1. Not to allow the Mexican Authorities to share information of so-called Ye Gon's "conversations", "interviews" and "admissions" at the first place. 2. If USDOJ had failed to set forth any restraints to prevent Mexicans from sharing such confidential information under the protection of 5th for whatever reasons ranging from being overzealous to recklessness, it would then be under the obligation to prevent Mr. Ye Gon from being exposed to Mexican Authorities manifested abuse and misconduct of such information for prosecutorial and convictional purpose in order to maintain the integrity of this Nation's Constitutional mechanism.   If that were the case, we would not see the same U.S. Department of Justice has been appearing here for so many years, almost a decade, tirelessly to help Mr. Velarde and his likes, to place Mr. Ye Gon into the peril they had publicly forecast: To rip off all 5th Amendment safeguard covering Ye Gon in violation of Article 3 of the Treaty. The right avenue is that the USDOJ should join hands together with Mr. Ye Gon's present defense counsels, after replacement of those unethical ones, to file a joint stipulation to end up this almost a decade long extradition bid.

Worst of all, if this case finally ended up with extradition, the Mexican government would definitely use what it claimed Mr. Ye Gon's "conversation" and "admission" as probably its only "inculpatory" evidence to prosecute and convict Ye Gon in the State of Mexico, because the records show Mexican government did not have any other prosecuting evidence of probative value which could be properly termed as "inculpatory evidence".

It is unclear how the Mexican authorities' misconduct in falsifying and willful concealment of key evidence passed unnoticed before Judge John Facciola's court. The underlying drug charge against Mr. Ye Gon was triggered by a container with PONU142447/8, containing 243 bushels of white colored chemical powder totaling 19.797 metric tons, intercepted and confiscated by the Mexican Customs, in December 2006, approximately 4 months after the Mexican COFERPRIS made its

final clearance of Mr. Ye Gon's inventory of ephedrine and pseudoephedrine under the coverage of his government issued license, and three months before the March 2007 law enforcement raid. The seized container, which Mexican authorities claimed to contain methamphetamine precursor chemical led to U.S. –Mexican law enforcement's raid on Mr. Ye Gon's residence and factory in the name of Unimed Pharmaceuticals on March 6, 2007. That raid dug out stash of cash of 205 Million U.S. dollars, other valuables and number of weapons in absence of physical examination, *with no meaningful finding of narcotic drugs*. For unknown reasons, the whole bunch of 19.797 Metric tons of alleged "meth-precursors" were ordered by Mexican Attorney General's Office to be destroyed in May 2008, during the intensified criminal prosecution proceedings in the United States.   Though Mexican government claimed that it took 5 grams of white powder as samples for forensic testing purpose from each bushel totaling 243 bushels before they were all destroyed.   *Mexican Authorities had persistently rejected the requests* made by U.S. government for sharing and delivering part of these samples drawn from Container PONU142447/8 for forensic lab testing here in the United States. What Mexican authorities offered its own forensic testing reports *were found tainted and/or falsified* by this nation's leading experts, as rebuttable affirmation of the falsity in tainted Mexican testing, which can easily be rebutted by credible FBI forensic testing during years of criminal investigation, yet Mexicans persistently refused to provide samples from container PONU142447/8, the triggering chemicals said to be narcotic precursor. None of these facts were spotted or caught by Judge Facciola before granting extradition.

To dispute these leading experts' finding is easy: to take samples drawn from that intercepted 19.797 M.T. of the case triggering chemicals for forensic testing in a credible FBI forensic criminal lab to see whether the white powder was indeed narcotic chemical precursor, if Mexican government had not played its insanity by refusing to release any sample to the United States, as being pinpointed by the Hon. Emmet Sullivan, the presiding U.S. District Judge who dismissed the prosecution with prejudice on 08/28/2009.

With time lapsed, it has gradually become clear why Mexican top law enforcement authority was so rush to make such a desperate move by making a public announcement alleging Ye Gon's so-called "interviews" and "admissions" while putting all lawyers from all sides of the time period onto the hot pan: **Mexican government had no decently presentable inculpatory evidence** or **for being caught for fraud with falsified evidence in support of its allegation in both criminal drug charges in the United States and for Extradition bid**. Therefore, it could only bet on what it alleged *participating lawyers' compromise* enabling Mexican authorities' public announcement to press, and bet on Mr. Ye Gon's own self-tarnishing "admission" to be an admitted "drug kingpin" "selling tons of meth precursors to Mexican black market", such an indecent public announcement had

gradually snowballed into Judge Facciola's wild finding of Ye Gon's mass-assembly of 600 killos of meth-precursor per day equalizing 420 killo of Methamphetamine production for each single day by approximately 70% ratio from pseudoephedrine into methamphetamine. Judge Facciola's finding of probable cause was so produced. Such legendary bold finding should instantly collapsed upon the fact that Mexican authorities had persistently failed to present not even a single gram of sample for testing from its seized 19.797 tons of so-called "chemical precursor" in PONU142447/8 triggering the whole case.

   If what Mexico authority publicized public announcement condemning Ye Gon's selling of tons of meth precursor on black market based upon so-called Ye Gon's own admission to U.S. DOJ in "interviews", "conversations" with the latter     were true, and it should be presumed for being true for the sake of arguments.    We are here to presume it true under the *doctrine of "persecutor's imputed opinion"(* "…his persecutors believed that he held that political opinion that he was harmed because of that political opinion." Singh v. Holder, 9th Cir. 2014, citing *Baghdasaryan v. Holder*, 592 F.3d 1018 1023 (9th Cir. 2010). because Mexican prosecutorial authorities manifested it would use it to prosecute Ye Gon following his extradition back to Mexico, the following question is why, and on what basis, the USDOJ would "informally" pass such "interviews" and the contents of the alleged interviews to Mexican government while in pushing for the direction of extradition?

If what Mexico authority publicized public announcement condemning Ye Gon's "selling of tons of meth precursor on black market" based upon Ye Gon's so-called own admission to U.S. DOJ in "interviews", "conversations" with the latter were true. We here must presume it were true under the doctrine of "persecutor's imputed opinion" because Mexican prosecutorial authorities manifested it would use it to prosecute Ye Gon following his extradition back to Mexico, where were Mr. Ye Gon's criminal defense counsels Mr. Retureta or Mr. Balarezo when such "interviews" and "admissions" occurred and what roles these two defense counsels were playing then?

Assuming arguendo that these allegation were true under the doctrine of " imputed opinion" that the alleged "interviews" and alleged "admissions" did actually take place under whatever improper circumstances, why should Mr. Retureta or Mr. Balarezo, Mr. Ye Gon's then criminal defense counsels would allow or initiate such "conversation", "interview" or "admission", or did not take any action to prevent it? Once it took place, why did the duet made 180 degree U turn to push for the criminal case 07-181 be disposed in the way as it was, for boasting their "victory" in gaining defendant's such *penal interests* narrowly by procedural wrinkles under Brady rule? The leaking Department of Justice has repeatedly argued that Mr. Ye Gon's criminal prosecution in the United States with case number 07-181 was dismissed upon the government's motion *in order to facilitate and pave the way for Extraditing* Ye Gon into the State of Mexico, to allow the latter to prosecute Mr. Ye Gon in the Mexico

because it would be the better forum.    With the U.S. Government's motive and purpose so explicitly stated in such a degree of visibility, why should Mr. Retureta and Mr. Balarezo, Mr. Ye Gon's them criminal defense/extradition defense counsels, after the alleged "compromise", were so enthusiastically pushing towards the same direction acting in orchestration with the USDOJ together to push for the same direction? To gain "penal interests" of "dismissal", while knowing abandoning Mr. Ye Gon's paramount interests in remaining his body in the United States would ultimately render their overly paid clients in ultimate peril in Mexico?    What Ye Gon's then defense counsels did is typical mal-practice in the light of Padilla v. Kentucky (Supreme Court, 2010) and United States v. Akinsaide (4th Circuit, 2012).

If what Mexico authority publicized public announcement condemning Ye Gon's "selling of tons of meth precursor on black market" based upon Ye Gon's so-called own admission to U.S. DOJ in "interviews", "conversations" with the latter were true. under the doctrine of "persecutor's imputed opinion", what these defense counsels should have done, under the cannon of professional ethics, is to preserve their client's "paramount interests" in remaining the United States by placing him in certain available Federal program, rather than pushing forward *to end up the criminal case 07-181* in concert with the DOJ's plan to give Extradition a priority.    that way by boasting their client's "penal interests" while failing to take any remedial measures facing Mr. Velarde's publicized public announcement.    During the months of December 2008 through August 2009, they could have done a lot to protect their client's paramount interests to avoid from exposure to Mexicans' improper prosecution in trampling upon our nation's constitution, particularly 5th and 6th Amendment by violating Article 3, 5, and 6 of the U.S. Mexico Treaty on Extradition, they could have done a lot to spare their client to have an exposure to Mexicans' infamous torture and political persecution for a disguised expropriation in violation of international law.    They had failed to balance all these factors while they were celebrating their client's transfigured "penal interests" they knew they did not deserve, because they did not even thoroughly read complete, or large part of, the case file. These are the textbook type of violation in the light Padilla v. Kentucky (U.S. Supreme Court, 2010) and United States v. Akinsaide (4th Circuit, 2012).

1. With the Petition for Writ of Error Coram Nobis filed with the U.S. District Court, the Asylum case pending with the U.S. Immigration Court in Arlington, Virginia, Petition for Administrative Review pending the U.S. Department of State, this undersigned, on behalf of Appellant/Petitioner Zhenli Ye Gon prays for an emergency stay of the extradition to save the petitioner from irreparable harm, also to avoid all pending actions being mooted out. Petitioner further humbly pray that the case 15-462 be kindly remanded back to the U.S. District Court for the Western District of Virginia for further consideration given to so severe mistakes involved in the totality of the underlying extradition case in connection to

consideration of the merits of the Petitioner's Motion pursuant to 18 USC 3188.

In addition to more severe errors and mistakes as being pin-pointed *infra*, the Magistrate Judge, the Hon. John M. Facciola's Certificate of Extraditability and Commitment Order rendered on February 9, 2011 will likely be reversed, revoked or at least modified. In the petition for Writ, Petitioner pointed out, Mexican government's Request for Extradition of "El Chino", the subject, with such confusing racial slur, must be rejected for correction, clarification, by at least deleting and cleansing such two lead charges as of all narcotic drug related criminal offense charges and charges of *money laundering offenses*, in order to maintain integrity and uniformity of administration of justice of the United States, in the wake of judicial disposition of both the U.S. criminal prosecution and seizures and forfeitures of the petitioner's property in the year 2009.

The fact Petitioner's property and asset which had been seized and forfeited by the United States Department of Justice, was ordered by U.S. District Judge Emmet Sullivan in related criminal case 07-181, clearly indicated that the triggering cause of Mexican authorities' money laundering charge in support of its request for extradition might also have been collapsed in accordance with Article 3 of the U.S. –Mexico Treaty on Extradition, because evidence in support such negation of any actual and potential money laundering charges at any place in the context of drug charges should be determined by the law of the United States, including judge made law. Judge Sullivan's judicial decision to render final disposition of the Petitioner's criminal charges and of seized/forfeited property/assets, against which the U.S. Prosecutor had failed to raise any timely appeal, therefore, it had become final as of the year of 2009, is by itself a *"law of the requested country"*.

    With all these in place, Mexican Deputy Attorney General's 10/23/20109 appalling public announcement accusing Ye Gon's "admission", the alleged U.S. DOJ's "informal compromising" such information as alleged, followed with the USDOJ's spokesperson Ms. Sweeny's "no comments" comments to AP; and the "incompetent counsels" issue by clouds of suspicion in triggering what should not have happened in advance, and failure to take any remedial measures afterwards, Extradition against Ye Gon after 8-year incarceration should be denied and dismissed with prejudice for shocking of conscience, in addition to the entirety of the chain of charging evidence in Mexico popped up case has long been collapsed.

"**It does entail an obligation not to extradite people who face procedures or treatment that "shocks the conscience" of jurists acting under the United States Constitution and within our current legal ethos. See *Rosado v. Civiletti*, 621 F.2d 1179, 1195-96 (2d Cir.), cert. denied, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980)   ("Thus, although the Constitution cannot limit the power of a foreign sovereign to prescribe procedures for the trial and punishment of crimes**

committed within its territory, it does govern the manner in which the United States may join the effort."). Cf. *Rochin v. California*, <u>342 U.S. 165</u>, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).   In the light of all these landmark precedents, it may be the high time for this Hon. Court to remand this Case back to the U,S. District Court for the Western District of Virginia to reconsider the Petitioner's 28 USC 3188 Motion, to end up the misery given to Mr. Ye Gon's year in year out constant incarceration after his drug charges was dismissed with prejudice and seized assets released. We are also here to call for the U.S. Department of Justice to reconsider its un-reconcilable practice in the wake of Mr. Velarde's 10/23/2009 Press Release, to coordinate with the Defense counsels to leading to a joint stipulations to cause this agonizing extradition be ended in decency.

A sense of decency denial of Mexico's indecent extradition request, in the wake of its foul play of the charging evidence and its Deputy Attorney General's indecent insults on U.S. DOJ's alleged improper revelation may have raised serious concern of the decency of this on-going extradition. Concern of "sense of decency" may be a proper ground in rejecting the Mexico's Extradition request. "Federal court's sense of decency" may limit extradition"; *In re Extradition of Burt*, 737 F.2d 1477, 1486-87 (7th Cir.1984) ("fundamental conceptions of fair play and decency" and "particularly atrocious procedures or punishments" may be considered by the court); Plaster v. United States, 720 F.2d 340, 348, 354 (4th Cir.1983) While a brutal tramping on the subject's constitutional rights may also form the ground in rejecting extradition: ("Individual constitutional rights" must be weighed to determine if extradition would be "fundamentally unfair"); *United States ex rel. Bloomfield v. Gengler*, 507 F.2d 925, 928 (2d Cir.1974), cert. denied, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (extradition may be "antipathetic to a federal court's sense of decency"). None of these entered into consideration of Judge Facciola, even given to such degree of indecency by Mexican authorities' 10/23/2009 surprising public announcement. Further, with such a fatal error as Mexicans' globally publicized attempt to prosecute/persecute Ye Gon using such "imputed frame-up" as what they "informally received" from the alleged USDOJ in place, among other errors being discussed, *infra*, Extradition from the United States to Mexico, as recklessly certified by Judge Facciola on February 9, 2011, must be terminated permanently.

## 2. <u>Newly Discovered Evidence in Overturning the Ground of "Probable Cause" Finding in Support of the Underlying Certificate of Extraditability</u>

A stay of extradition may be proper because of the highly likelihood of the prevailing of the Coram Nobis Petition and Asylum Petition.

Newly discovered evidence that may have clearly indicated there was then, as is now, no probable cause in support of Certificate of Extraditability, may have overturned USDC Magistrate Judge John Facciola's Certificate of Extraditability

rendered on February 9, 2011. (USDC ECF Docket: 08-596 Doc. 176), the triggering cause of the underlying case being appealed to this Judicial Circuit. The Certificate and Commitment, formed upon that Magistrate Judge's seriously misreading, misinterpretation and misperception of such key "inculpatory" evidence at the heart of the underlying case, if any, if untainted, as Dr. Thomas Lectka's expert testimony:

> **"First, Dr. Lectka testified that the first of the four shipments imported by the respondent in this case were designated as containing "N-acetyl pseudophedrine."** ECF Doc P21 (Exhibit 7)

Judge Facciola's finding of extraditability based upon Dr. Lectka's expert witness testimony (and bunch of false "inculpatory" evidence either tainted or perjured by lousy Mexican authorities) was recently proven wrong.   The following is Dr. Lectka's clarification statement rebutting and disputing Judge Father Facciola's arm-twisted citation:

Professor Lectka's disputing statement as follows, among others:

"I recently have been advised that certain other people may suggested or claimed that I somehow testified during this case that the substances seized from Zhenli Ye Gon's companies by Mexican authorities were, in fact, of a particular chemical type, or that I somehow verified the validity of the Mexican Government's laboratory findings. Any such claim is untrue.   …I was simply asked instead to assume (without agreeing) Mexico's claimed laboratory findings as a given (because that is what U.S. extradition law requires), so that I could then give my key opinion: whether Mexico's claimed chemical substances (N-acetyl-Pseudoephedrine and ephedrine acetate) represented "controlled substances" under U.S. Law." (Please refer to Dr. Thomas Lectka's Affidavit dated March 11, 2015 as Exhibit 8)

With Dr. Lectka's sworn Testimonial Statement made under oath in place at this time, that "Dr. Lectka testified" so-called the shipment (19.797metric tons) "imported by Respondent in this case "as containing 'N-Acetyl-Pseudoephedrine" was NOT what Dr. Lectka actually testified, it was Magistrate Judge Facciola testified by putting what he wanted in forming the factual basis in support of his Certification.
   Magistrate Facciola's fact finding in support of his prejudicial, arbitrary, capricious finding of facts in support of his abusive certification of extraditability may have fatally collapsed in substance not only because he wrongfully twisted Dr. Lectka's testimony, but also recklessly turned blind-eyes to such overwhelming exculpatory evidence as experts' opinions having pinpointed that Mexican Federal Government's all laboratory testing on Ye Gon imported samples were all severely tainted in violation of all internationally accepted scientific standards, as hard proof of the Mexican government's fraud and perjury in framing a groundless and frivolous

prosecution against Ye Gon for politicized ulterior motive.   On top of all these falsified evidence in fooling the U.S. justice system, Mexican authority also willfully and contemptuously concealed, and even prematurely destroyed/eliminated such key evidence as samples taken from what it had claimed as 19.797 metric tons of "meth precursor" chemical from the shipment container PONU142447/8 to the United States forensic laboratories.   Despite Ye Gon's then Defense Counsel Ning Ye's numerous, repeated, and vigorous demand for such samples from 19 tons of a whole lot safely stored in Army Battalion, Mexican government flatly refused to release any single gram of such a chemical sample to all the litigation participants. While concealing the samples from "Ye Gon" shipments of "meth precursor" for credible forensic examination in the United States, Mexican government, together with case workers on the USDOJ side, offered scattered dirt collected from the corners of Ye Gon's Mexican UniMed Company, involving all fancy ephedrine and even meth residues and particles, in order to prove the existence of mass production of methamphetamine precursor chemical 600 kilos per day, an implicit rough equation to more than 420 kilo of Meth, according to 70% turning out ratio, being contributed by Ye Gon and his "trusted team" that has never in actual existence. (Ephedrine/Pseudoephedrine residues found and collected from a place where transacting of such precursor chemical had been licensed by the Government and was supervised by Mexico's COFEPRIS, that had yet to issue clearance of Unimed's last stock of legitimate chemical precursor inventory on upcoming July 2006 did not make any sense, except misleading, confusing and fooling the U.S. Court.

Voluminous exculpatory evidence in a completed chain had been ever built on Ye Gon's side that the Mexican government did not have any probable cause either in aid of the U.S. criminal prosecution or in support of its probable cause of extradition request.   Almost all enumerated factual citations lining up in Magistrate Facciola's Certification are either falsified and perjured by Mexican authorities, or fatally defective.   Such "Mexico's claimed laboratory findings as a given" sets of presumably "chemical precursor to meth" is nothing but the fruit of Mexican Laboratories' proven foul play under both the Custom Administration and under the Attorney General's Office were dishonestly tainted, falsified, and abused according to Dr. Ingram and Dr. Brown's Expert Opinion.(Exhibit 9 and 10)   With such a challenge on the validity of Mexico's inculpatory evidence, it is easy for Mexican government to clear up all such clouds of suspicions and challenges: Simple. It simply needs the Mexican government to pick up one gram as chemical sample from the last shipment of Ye Gon's "meth precursor" from PONU142447/8 container for the credible U.S. FBI forensic laboratory to properly examine, and test. **U.S. side had waited for years with repeated demand for sample without progress.**

In the meantime, Mexican Authorities had persistently refused to cooperate with the U.S. Government by providing another key evidence, as a copy of un-altered

Mexican COFEPRIS controlled pseudoephedrine transaction log book regarding Ye Gon's Unimed, no matter how hard and how frequent Ye Gon's such a then good defense counsel as this undersigned pressed to demand.   Mr. Ye Gon's narcotic drug charge being cooked up by Mexican Government smelled terribly wrong, it seemed perjured, aborted and collapsed evidence wise at the first place.   There is totally no substance in substantiating the labels being used by the Mexican government in support of its request for extradition either because the regime has been totally corrupted in handling every simple matter or it completely has no case, nor can it even be able to remotely establish any "probable cause".   All Mexican narcotic drug charge is built upon Mexican government's fraud and perjury.

By its entirety, the Request for Extradition should have long fallen apart for Fraud upon the Court.   Respondent in this case must be given a review, by way of omnibus Petitions for Writ of Error Coran Norbis, in connection to a new Habeas Corpus, in order to correct USDCDC Magistrate Judge Facciola's fatal errors leading to his erroneous finding of probable cause and certification of Extraditability.

### 3.  **Petitioner's Pending Asylum Case with the U.S. Immigration Court at Arlington, Virginia May Need to Be Considered by this Hon. Court before Affirming Extraditability**

Ignored from the prior arguments from both sides that Petitioner is an asylum applicant pending adjudication. About his pending asylum case with the U.S. Immigration Court at Arlington, Virginia, and the case status and grounds in support of the pendency status, please refer to one of the filings with the Immigration Court, E-copy, as Exhibit #2.   At this moment and dating back to the time when the Certificate of Extraditability was first issued, the Petitioner may not be extraditable, *nunc pro tunc,* because the courts had ignored a critical fact that Petitioner claimed imminent political persecution and filed an asylum with the USDHS, the Application is pending the Service. A court ruling allowing extradition, or affirming Certificate of Extraditibility to permit law enforcement agency, including U.S. Department of Justice, U.S. Department of State, to extradite, return, refoule the Petitioner to the claimed persecuting State of Mexico, is substantively and procedurally in violation of the following: Due Process under the 5th Amendment which guarantees the Petitioner with a "full, fair and meaningful hearing" on his Application for Asylum; Geneva Protocol addressing Refugee Status, particularly legally binding Article 7, "non-Refoulerment" clause, being incorporated in Article 208 of the U.S. Federal Enactment, i.e., U.S. Immigration and Nationality Act; In violation of Article 5 of the U.S.-Mexico Extradition Treaty; and of Article 3 of UN Torture Convention Treaty, given to testimony of similarly situated torture victims, and voluminous credible reports on broadly infected tortures in the State of Mexico (Rates of tortures has 600%

increase during the decade from 2004 through 2014 by credible Amnesty International Report.)

1. Due Process under 5th Amendment violations in denying the Petitioner a "full, fair and meaningful hearing" on "sufficiency of evidence" as well as gross and total violations of Article 3 of the U.S.-Mexico bilateral Extradition Treaty;

2. In light of Due Process Violation in context of violation of Article 3, a total violation of Article 6 Non bis in idem, **where the changed version and circumstances by Mexican Top Authorities' Criminal accusation on and after 10/23/2009 had been left unnoticed while argumets followed with Judge Facciola's 02/11 Certification only addressed the Requester's old version of 2008 Extradition Resquest.    .**

3. Ineffective Counsel's Assistance to such a degree that such incompetence has completely deprived Petitioner's procedural safeguards under the <sup>6th</sup> Amendment, by tampering Petitioner's exculpatory evidence, obstruct of justice by abusing all pretrial procedural justice possibly in collusion with penetrating foreign power, Petitioner's <sup>5th</sup> Amendments, having caused catastrophic consequences left into this whole set of extradition framework by Petitioner's prior counsels in criminal defense proceedings;

4. In violation of Article 3 of UN Torture Convention, Article 7 Geneva Protocol in Refugee Status, incorporated into U.S. Immigration and Nationality Act, given to Petitioner's Application for Asylum is pending the USCIS; given to testimony of similarly situated torture victims, and voluminous credible reports on broadly infected tortures in the State of Mexico;

**4.Likelihood of Success in One or More Pending Matters to Support Motion to Stay: District Court's Denial of Habeas Relief to Allow Extradition Should be Reversed As Error Corum Nobis Petition and Other Petitions**

Several Courts may not have sufficiently weighed the treaty bar to extradition set forth in Art. 5 of the U.S. – Mexico Extradition Treaty.   Therefore, the Decision in Support of Extradition may need to be reconsidered.

Article 5 of the Treaty provides:

Extradition shall not be granted when the offense for which it is requested is political or of a political character.

**If any question arises as to the application of the foregoing paragraph, the Executive authority of the requested Party shall decide.** (emphasis added)

Here, the Requested party means the United States. The Executive Authority may mean, at this moment, the U.S. Immigration Court at Arlington, Virginia, where Mr. Ye Gon's case is pending a legally mandated "full, fair and meaningful hearing" under the procedural due process, in "administrative closure" status, re-openable upon motion by either party or both parties. (Please see Exhibits 2, 3, 5)

These preliminary, threshold issues may or may not have been briefly argued and heard by this Hon. Court and slightly touched by the lower courts, however, what was not clearly addressed before this Hon. Circuit is that the proper venue which may need to be given opportunity of certain priority in chorological order to adjudicate Treaty's Article 5 issues is the "Requested party's" "executive authority", that is, at this moment, the Arlington Immigration Court.

To allow the U.S. Immigration Court to first adjudicate the Petitioner's Asylum Application may avoid a head-on collision to the U.S. government's highly visible obligations under the international treaty obligation as well as under the mandate of federal law governing "non-Refoulement". Such a practice has been well recognized in numerous cases in the United States and European countries, while the execution of final order of extradition be stayed or reversed allowing adjudication of the extraditee's asylum claim. (See a European Human Rights Court's Decision on Armand v Home Secretary and Minister of Defence of Royal Netherlands Government [1943] AC 147; and section 9(2) of and paragraph 6(1) of Schedule I to the 1989 Act.)

Non-Refoulerment, i.e., a political refugee shall not be extradited into a regime of claimed persecution. Non-Refoulerment is a legal norm emerged during the French Revolution, and it has been adopted by international community and super majority of countries since the World War II. Later the legal principle was adopted and codified in UN Geneva Protocol on the Status of Refugees to which the United State is a participating country, and the Congress made it into Federal law, namely, U.S. Immigration and Nationality Act.

Non-Refoulerment means a sovereign state shall be bound by international treaties with binding obligation not to extradite, or refouler, a political refugee, an asylum seeker, into the hands of the regime of claimed prosecution. To determine whether a claimant of fear of persecution, a fair, full and meaningful proceedings in adjudicating one's asylum application must be offered to him as Due Process under Constitution, the supreme law of the land, mandated.

The principle of *non-refoulement* constitutes the cornerstone of international refugee protection. It is enshrined in Article 33 of the 1951 Convention, which is also binding on States Party to the 1967 Protocol. Article 33(1) of the 1951 Convention, which was officially adopted by 1967 Geneva Protocol, to which the United States is a contracting party, provides:

"No Contracting State shall expel or return ("*refouler*") a refugee in any manner whatsoever to the frontiers of territories where *his [or her] life or freedom* would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion."

Mr. Ye Gon filed an Application for Asylum which is pending. (See Group Exhibit #2, 3, and 5) He is yet to be given due process attached hearing adjudicating his Asylum Application. Therefore, timing for extradition is not NOT Ripe.

Later, Petitioner Ye Gon respectfully filed this Petition for Writ of Habeas Corps with the U.S. District Court Western District of Virginia, arguing that Petitioner should be released from his 8-year incarceration for USDOS's violation of 28 USC 3188 (Case Number 15-496)

Assuming, *arguendo,* Petitioner Ye Gon were an extraditable felon, a fugitive having been convicted in either or both Requesting and Requested countries, *while actually he is not*, Petitioner may not be extraditable, or may not be immediately extraditable, because he filed an Application for Asylum and his claim for asylum has not yet been adjudicated and finally denied with exhaustion of proceedings, by the "Executive authority of the requested Party", herein this instant case, are the U.S. Department of Homeland Security and the U.S. Immigration Court under the U.S. Department of Justice, including the U.S. Broad of Immigration Appeals (BIA). The fact is the requesting party Mexican authorities has failed to provide "sufficient evidence", any meaningful evidence in support of its "probable cause" in drug related charges due to its either fraudulent behavior in tempering and contaminating evidence or willful concealment of evidence, a irreparable failure to meet its liability under Article 3 of the Treaty.

Petitioner filed his Application for Asylum with the USCIS under the U.S. Department of Homeland Security in July 2007. (See Exhibit #2,)   Due to Petitioner's open-ended incarceration without conviction and bail, he was unable to appear in the administrative interview with the USCIS/USDHS. His asylum case was then referred to the U.S. Immigration Court in Arlington, Virginia.   His case has been then pending the US Immigration Court pending adjudication (See Exhibit #3.) Without final disposition of Petitioner's political Asylum Application, the timing to extradite the fugitive, a claimed victim subject to the requesting country's political persecution, under whatever disguises, **will have to be premature, because his asylum application should be given priority for adjudication in order for the United States not to violate its international treaty being reduced into its own domestic federal law regarding the jus cogens of "non-refoulement" since French Revolution.**   The super majority judicial circuits, after 2005 National Real ID Act, adopted the legal principle that the legal norm of Non-Refoulement should be implemented in the Habeas Corpus cases through immigration proceedings.   Herein this case, the **application of Non-refoulement regarding Ye Gon verses**

**Extradition, the immigration law governs and the Immigration Court in Arlington Virginia should be given priority to adjudicate his asylum application first   in order to answer the question whether Ye Gon's extradition into an infamously corrupted regime of Mexico being infected with broadly spreading tortures and extrajudicial killings.**   Mexico's broadly infecting infamous epidemic of tortures having victimized similarly situated victims, including proven innocent victim, is sufficient to extend Article 3 of the CAT to Mr. Ye Gon to spare him from the extradition in operation of immigration law, he does not have to prove he himself was tortured.

Premature order of extradition in a form of denial of habeas relief should have been reversed to avoid irreparable harms.   Such a denial of Habeas Relief is a heads-on collision course violation of Article 5 of the U.S. – Mexico Treaty on Extradition, in connection to Article 33 of the 1951 Geneva Convention adopted by 1967 Geneva Protocol on Refugee Status, to which the United States is a bound signatory, as well as Article 3 of the UN Torture Convention (CAT), both international treaty obligations have been incorporated into the U.S. Federal legislations, i.e., Sec. 208(a) of the INA or 8 USC 1158, which provides the following, among others:

"1. Extradition shall not be granted in when the offense for which it is requested is political or of political character. If any question arises as to the application of the foregoing paragraph, the Executive authority of the requested Party shall decide."

Article I of the Geneva Protocol provides a non-refoulerment provision (set forth in U.N. 1951 Hague Convention on the Status of Refugees, Article 33, which was incorporated and mandated for contracting parties to adopt Art 2 through Art 34 of the 1951 Convention) mandating all participating countries, including the United States, not to return and refouler a political refugee back to the country of claimed persecution. Such a provision is incorporated into the U.S. Federal law under 241(b)(3) of the *Immigration and Nationality Act* , and no extradition/refoulerment of a refugee under 8 USC 1158. Whether or not an asylum applicant is eligible for protection under law of refugees protection and federal law of CAT protection is governed by Executive Branches, starting to USDHS, US Immigration Court under the USDOJ, the Board of Immigration Appeals (BIA), and under certain circumstances, subject to judicial reviews by the U.S. Court of Appeals, up to U.S. Supreme Court.

As Article 5 of the Extradition Treaty provides: if political asylum related issues were raised, the Executive authority of the requested Party shall decide the matter. As the U.S. Supreme Court observed in *Landon v. Plasencia,* "control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), the Supreme

Court precedent support Article 5 of the Treaty. Once an asylum application is filed, there as is here, it will be an *constitutional due process violation* if that asylum seeker is not provided a fair, full and meaningful hearing before deporting, refouelring, or extradite him into the country he claimed as the ultimate source of political persecution and/or a country of prohibited land under Article 3 of UN CAT.

Denial of Petitioner Ye Gon's Petition for Writ of Habeas Corpus to allow an immediate extradition into the State of Mexico, a country of what Petitioner claimed to be a country of political persecution against him and life threatening torture looming over him, given to credible country condition reports and testimony of similarly situated torture victims of Chinese ethnicity, Mr. Ye Gon should not be allowed to be extradited into Mexico unless, and until, his Application for Asylum was denied and all procedures were exhausted in this paradigm of law.

Whether or not Petitioner can claim for protection under asylee/refugee status is an issue yet to be adjudicated, where Petitioner should have been safeguarded with procedural due process. U.S. *Due Process* Clause *requires* in removal proceedings is the right to a *full* and *fair earing. ... meaningfully* participating in immigration proceedings…"  M-A-M-, 25 I & N Dec. 474 (BIA 2011) Deportation and asylum hearings, however, are subject to the requirements of procedural due process. *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Yamataya v. Fisher (The Japanese Immigrant Case),* 189 U.S. 86, 100-01, 23 S.Ct. 611, 47 L.Ed. 721 (1903); *Gandarillas-Zambrana v. BIA,* 44 F.3d 1251, 1255 (4th Cir.1995).

It has been well established that in assessing whether a deportation or *asylum hearing* has comported with due process, courts are guided by the principles of *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), in which the U.S. Supreme Court recognized that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."8As the Court acknowledged, what constitutes being heard at "a meaningful time and in a meaningful manner" will have different meanings in different circumstances, and due process only "calls for such procedural protections as the particular situation demands." *Id.* at 334, 96 S.Ct. 893. Because of the Government's compelling interest in controlling immigration, hearing procedures that comport with due process in the asylum context might well be unacceptable in other proceedings. *Mathews v. Diaz,* 426 U.S. at 79-80, 96 S.Ct. 1883. Nevertheless, due process requires, at a minimum, that the INS adopt procedures to ensure that asylum petitioners are accorded an opportunity to be heard at a meaningful time and in a meaningful manner, i.e., that they receive a full and fair hearing on their claims. *Jacinto,* 208 F.3d at 727; *Campos-Sanchez,* 164 F.3d at 450; *cf. Landon v. Plasencia,* 459 U.S. at 36, 103 S.Ct. 321; see also *Gandarillas-Zambrana,* 44 F.3d 1251, 1257 (4th Cir.1995)

(concluding that IJ's questioning in deportation hearing did not violate due process because it did not deprive petitioner of "fair and meaningful hearing").

In this instant case, the government of the United States is barred from an straightforward returning, refourler, or extradite Petitioner into the hands of Mexican authorities, the authority of the claimed political persecution and claimed inflictor of fearful, indecent and life threatening tortures, without first allowing this Petitioner to exhaust his "fair, full and meaningful asylum proceedings".   Therefore, the lower Court's harsh move to expedite his extradition by denying his Pray for Habeas Relief ahead of time should be reversed for unripeness under Article 5 of the Treaty in connection to binding Geneva Protocol, UN CAT, and corresponding Federal Laws.

5.  **Mexican Government's Request for Extradition Should be Rejected for Violation of Article 3 of U.S. – Mexico Treaty of Extradition**

The momentum was gradually built up in the direction of landslide support of the Petitioner's extradition after Magistrate Judge John Facciola mis-found the following factual basis as being observed by this Hon. Judicial Circuit and apparently weighted by this Hon. Court in rendering its decision:

"The extradition magistrate found that Ye Gon falsely certified the content and origin of import shipments *containing precursors to pseudoephedrine*, a "list I chemical" under 21 U.S.C. § 802(34)(K) and 21 C.F.R. § 1310.02(a)(11); that he *built a plant capable of manufacturing pseudoephedrine and other psychotropic substances*, *despite lacking the Mexican permit necessary to do so; that workers in this plant produced over 600 kilograms a day of a "white crystalline powder," and the analyzed samples of this powder contained pseudoephedrine and other psychotropic substances*; that despite such production, Ye Gon reported no income for the plant or for Unimed during this time period; that either Ye Gon or his driver transported the powder away from the plant; and that Ye Gon was found to have powdered pseudoephedrine hydrochloride, a salt of pseudoephedrine, in his office *ten months after the company was supposed to have sold off all legally acquired inventory of that substance.* These findings are sufficient to give rise to the inference that Ye Gon knew that the chemicals he imported, transported, manufactured, and possessed would be used to produce psychotropic substances. Therefore, these Mexican drug offenses are also crimes under the laws of the United States." (Emphasis added)

First of all, resting the finding of extraditability upon "finding of drug-precursor" is a procedurally violated Article 6 of the Treaty, *i.e., Non bis in idem given to the fact that Valinda Jones, Esq., the litigating AUSA repeatedly expressed that she opposed any attempts to have the done-deal drug case under 07-181 "re-litigated"by a different*

*judg.*. None of the participants of the judicial proceedings in these lower courts, including such loose cannon as Deputy Attorney General Velarde, from Mexico, have been fully aware or conscious of, the fact that their continuing focus narrowly upon narcotic drugs or their precursors, have violated Article 6 of the Treaty.   Because drug related charges brought by the AUSA in the U.S. District Court for the District of Columbia was dismissed with prejudice.   Soon afterwards, all the properties or allegedly "drug" proceeds found, seized and forfeited in the United States was ordered to be returned to the lawful/legitimate owner, say, this Petitioner. U.S. District Judge Emmed Sullivan's order to return the seized and forfeited property, apparently clean of drug, has rendered that untimely, improper Mexican Request for Extradition *moot* and *non-reddressible* taking Article 19 of the Treaty into account and deeming the U.S. final Judicial disposition proper and integrated. Noticeably, the U.S. Department of Justice had never appealed the Court's final disposition regarding the merits of the prosecuted matter and of the property disposition.    The case should have been over.

Finally, the U.S. Department of Justice has slimy won the extradition bid by resting all its weight upon Blockgurg v. United States, 284 U.S. 299, by presenting a line of Mexican charges of other offenses that were not the "same offense" under Blockgurg test.*

   *The fraction of hair jurisprudence based upon Blockburg may be extremely weak regarding the government's arguments on "same set of acts, yet not the same offense." The shaky Blockburg doctrine has been seen revised in numerous authorities after Blockburg, for instance, Brown v. 432 US 161 (1977), in which the Supreme Court vacated the double jeopardy 2nd conviction in Joyriding after conviction of car theft, forbids successive prosecution and cumulative punishment, as the Court held. Critically omitted here is Mexican authorities' commitment to the United States, to make the Blockburg case relevant, governing, applicable, and meaningful, that all drug related criminal charges would be ***cleanly excluded*** from its Extradition Request; Additionally, Mexican authorities, the requesting party, should commit to the Government of the United States, the requested party, that it would not prosecute the Petitioner for any narcotic drug charges once the Petitioner is actually extradited to Mexico, in order to honestly avoid a violation of Non bis in idem under Article 6 of the Treaty, and in order to honestly avoid a violation of U.S. Constitutional safeguard of "double jeopardy".

These charges of "other offenses", including "smuggling of Chinese commodities" and "evasion of taxes", being added into the laundry list of "offenses", after Mexican Deputy Attorney General acted as an loose cannon to publicize what he quoted as the Petitioner's "admission" in his "interviews" with the USDOJ prosecutors to all domestic and international media, among them, "the Universe", on October 23 2009.

Let's come back to substantive violation issues regarding Article 3: Sufficiency of evidence in support of Mexican government's request for extradition:

In a hearing determining returning of the U.S. law enforcement seized and forfeited, allegedly, "drug proceeds", Judge Emmet Sullivan found that the Mexican authorities,

during a period of two years, had persistently failed to present the U.S. Court with evidence in support of its drug charges.

Such a badly smelling finding of facts originated from the Magistrate's Memorandum in support of Certificate of Extraditability appears completely baseless and in ignorance of the case related evidence at all.

"…shipments *containing precursors to pseudoephedrine*, a "list I chemical" under 21 U.S.C. § 802(34)(K) and 21 C.F.R. § 1310.02(a)(11)"?   Wrong.

None of the 3 dozens of lousy Mexican prosecutorial authority's factual allegation, including Mr. Velarde's defamatory media publicity, being blindly cited by Magistrate Judge John Facciola appeared of any accuracy.

The shipment hereby referred to means the case triggering shipment regarding container number PONU142447/8, a 19,7 metric tons of white powder allegedly pertaining to the Petitioner, which was intercepted by the Customs Administration of Mexico on December 2, 2006 had prompted the joint law enforcement raids upon the facilities in Toluca, Mexicp, followed with arrests on Mexican side   and criminal prosecution starting March 2007.   Both the National Crime Laboratory under the Mexican Attorney General's Office and the Forensic Laboratory under Federal Customs Administration of Mexico conducted series of testing and examinations to determine what was indeed the chemical agents are.   They obtained the conclusions: Samples taken from the triggering container PONU142447/8 contains "ephedrine" and "*pseudoephedrine",* noticeably with *uncertain amount and uncertain ratio,* because the Crime Lab report also concludes simultaneously, uncertain amount and uncertain legal chemical agents was also found as testing results shows.

Voluminous Mexican Crime Lab examination archive, including all testing charts and testing records were presented to this nation's two top notch forensic/pharmaceutical chemists to read and evaluate.   Their conclusion:   Mexican PGR's way of conducting laboratory testing was "contradictory, seriously inaccurate, scientifically unreliable" (Assistant Professor Leverne L. Brown's expert opinion.   Howard University, Dept. of Pharmaceutical Science,   (Exhibit #10)   These PGR forensic lab tests (as the foremost evidentiary basis of Mexican Defendants' "drug Kingpin" charge in covering up its illegal expropriation against all plaintiffs—added), are "deficient both procedurally and substantively." Mr.. Vedoster, PH.M, and MS, a veteran forensic chemist working with DEA/DOJ for quite long time.   Mr. Ingram pinpointed such deficiency as follows:

"In the forensic science community, especially in the testing and handling of confiscated alleged controlled contraband or drugs, the highest priority is placed on preserving the integrity of the sample during the testing handling.   In none of the tests (gas-chromatography and infrared spectrometry) were standard samples of

pseudoephedrine and acetethamtine used. If the presence of either one of the compounds were suspected, tests could have been performed to ensure identification." (Exhibit 9)

Mr. Ingram also pinpointed that Blanks runs for testing of the purity of the testing instruments were missing! Therefore there was no "non-destructive methods were employed in the testing! "None of these (standard-added) approaches were utilized in this instant situation to establish the identification of the samples confiscated from Unimed."   Mr. Ingram's scientific conclusion: "*Overall, in my opinion, no conclusion can be established as to the identification of the confiscated samples due to insufficient testing*." (Expert Opinion outside Group Exhibit as Exhibit #9, Emphasis added.) The Mexican Crime Lab's testing and handling appears particularly suspicious given to its missing key information as to percentage of the precursor vs. legal chemical agents in absence of certification of purity and calibration of testing instruments that must have been free from contamination of residues left by the prior testing process, using the lay person's words here. Therefore, Mexican authorities' conclusion based upon its own documentary evidence regarding identification of controlled substance or its precursor is self-destructive, incredible, may have highly likely been falsified. (Exhibit 9)

**Originally, such a suspicion can easily be rebutted and the deficient, likely falsified testing deficiency, can be easily corrected by engaging the United States FBI laboratory to conduct forensic testing or have an internationally reputable 3rd   Party testing laboratory to conduct the tests using the sample taken from Container PONU 142447/8 again within a reasonable period after December 2006.** During a prolonged, say, the first 12 months period of criminal proceedings taken in the U.S. District Court for the DC (Case 07-181) while this undersigned counsel was the lead defense counsel in the case, requests for samples for such better testing had been repeatedly made and rejected (See part of the hearing transcript dated March 18, 2008, Exhibit #4).   The USDOJ proffered to the U.S. Court that it was unable to receive samples from Mexican government, about nine months after Grand Jury Indictment and 14 months after the interception of the triggering 19.797 Metric tons of so-called "precursor" chemical agents in PONU142447/8 in December 2006 . According to Court Records: Samples that may be used to rebut the Petitioner's challenge alleging Mexican PGR Crime Lab Testing being falsified and defrauding was willfully concealed at least during the period from March 18, 2008 (Group Exhibit #4), which such samples presumably drawn from PONU142447/8 had never been released to the USDOJ until the criminal case 07-181 was dismissed with prejudice on or about August 28, 2009..

Mexico government refused to provide any single gram of testing samples from PONU 152447/8 (Exhibit 4).   Such a suspicious and willful concealment has rendered the Mexican PGR's *tainted and deficient* forensic testing lack of probative

value and rendered such deficiency in "both procedures and substance" an irreversible falsity for the records.   Facing such fatal failure in its own forensic testing of samples from the confiscated Container, Mexican PGR rushed to Unimed's laboratory to collect dirt and residuals in its facilities, popping up the PGR's finding that testing of such dirt finds "pseudoephedrine" and, even wilder, "methamphetamine".   The finding might have had merits if the same PGR could present Unimed's Log Book, particularly a copy of unaltered log book, which recorded the office clearance of each licensed ins and outs, and that of inventory of pseudoephedrine uder government license.   At this point, lousy Mexican government failed again.   It had failed to present the U.S. Court with what it confiscated from Unimed the log book as a whole, except for a few pages with either blackened or blank, an evidence left with intentional alteration and destruction can be deemed as intentionally tempering the evidence and obstructing justice, regardless the Plaintiff Ye Gon' then defense counsel raised the demand for Unimed Log Book for no less than 16 times during the first whole year of the criminal litigation that ended up in dismissal with prejudice.   All such frauds and perjury indicated that the government of Mexico has made up a "drug case" of falsity by its totality and every bit thereof in covering up its crime in its illegal and immoral expropriation in violation of international law as well as the due process under the U.S. Constitution. It is not because there was no such log book, in whole or in part, found in Mexican case archive, **it is simply because the Mexican prosecutorial authorities had altered and forged that critical evidence addressing the key evidentiary issue at the heart of the case, or because the log book was exculpatory in nature, like triggering samples, therefore, without manipulation and falsification, the Mexican authority refused to release the unaltered log book.** There were copies of the Log Book with all exculpatory contents blackened.   Some pieces of contents from the unaltered pages of the log book were still found which may partially exonerate Mr. Ye Gon's narcotic drug charge. (Exhibit 9A).

With all these fatality of unforgivable errors in place and highly visible, Magistrate Facciola still felt comfortable to hold:

"…he (the Petitioner) *built a plant capable of manufacturing pseudoephedrine and other psychotropic substances*, *despite lacking the Mexican permit necessary to do so*; that *workers in this plant produced over 600 kilograms a day of a "white crystalline powder," and the analyzed samples of this powder contained pseudoephedrine and other psychotropic substances*; that despite such production, Ye Gon reported no income for the plant or for Unimed during this time period; that either Ye Gon or his driver transported the powder away from the plant; and that Ye Gon was found to have powdered pseudoephedrine hydrochloride, a salt of pseudoephedrine, in his office *ten months after the company was supposed to have sold off all legally acquired inventory of that substance.* These findings are sufficient to give rise to the inference that Ye Gon

knew that the chemicals he imported, transported, manufactured, and possessed would be used to produce psychotropic substances. Therefore, these Mexican drug offenses are also crimes under the laws of the United States." (Emphasis added)

*"...Ye Gon was found to have powdered pseudoephedrine hydrochloride, a salt of pseudoephedrine, in his office ten months after the company was supposed to have sold off all legally acquired inventory of that substance.."? Wrong.*

Such a finding virtually inherited from DC Magistrate Judge Facciola clearly demonstrated the Magistrate's unfamiliarity of the evidence, particularly when he mentioned residues of pseudoephedrine and other psycho agents were powdered 10 months after all "acquired inventory was, and should have been sold off."   The Records show Unimed facilities were raided, virtually destroyed and sealed in March 2007. **The last and final Mexican COFEPRIS official clearance and auditing of the Petitioner Ye Gon's remaining inventory of government licensed pseudoephedrine was *July 28, 2006 (Exhibit #9A).   Ten month after July 28, 2006,* according to kindergarten calculation by fingers, was May 28, 2007, i.e., two and half month after the PGR's raid, destruction and sealing of the Unimed and arrests and detention of all Unimed Workers, including gardeners and construction workers happening to be at wrong place and wrong time.   "… workers in this plant produced over 600 kilograms a day of a "white crystalline powder," and the analyzed samples of this powder contained pseudoephedrine and other psychotropic substances" 10 months after final COFEPRIS clearance of the inventory on July 28, 2006?**

Judge Faciola's fancy finding made readers to imagine that all the Unimed workers were producing 600 killo drugs a day for Unimed inside maximum security prison! It is not absolutely impossible.   Everything is possible in the State of Mexico. The missing link here is an official certification from Mexican Authority certifying that those Unimed Workers were working for the Petitioner to powder or producing psychotropic/narcotics for Ye Gon 600 kilos a day under 24 hours monitoring of the prison guards.   The maximum security prison in the State of Mexico might be the only possible place to mass assembly 600 kilos narcotic drugs per day safely shielded from other competing cartels' hot pursuit and mass murder.

**Magistrate Judge John Facciola's wildly imaginative finding made in February 2011 may have been formed under the overwhelming improper influence by his misreading of Dr. Lectka's Expert Testimony, being corrected now, and Mr. Velarde's "incriminating" propaganda invoking U.S. prosecutors' alleged "informal leaking" of Mr. Ye Gon's alleged admission" of having manufactured "tons of" meth precursors on black market. Neither should be the basis for Extradition, consequently, Judge Facciola's Certification should be reversed.**

Magistrate Judge Facciola repeatedly mentioned the fact that Petitioner Ye Gon has admitted that the chemical agents he imported in PONU 142447/8 is Acytal-Pseodoephedrine based upon expert opinion presented to Faciola Court by a John Hopkins professor in chemistry on behalf of the Petitioner, (Professor Thomas Lectka), who has now sharply rebutted Judge Facciola's wrongful mis-quoting.   It must be pointed out that the testifying professor did not conduct any independent laboratory testing, neither had he had any access to PONU 142447/8 Container samples.   Therefore, his testimony was merely based upon his reading of the Mexican crime lab forensic examination testing reports, which, as both Dr. Brown and Mr. Ingram pointed out: was *deficient, unreliable, and inconclusive*.

Nevertheless, Magistrate Judge's ten-month + 600 killo/day formula, virtually based upon nothing, has exerted lasting harmful influence upon all his successors adjudicating this same case, tiptoeing the fine line not to risk political incorrectness to help a "narcotic drug kingpin" whose daily mass production of narcotic drugs or drug precursors, alone, may have over flooded Meth market world over.

None of the participating parties in these proceedings has ever been aware that arguments narrowly focused upon the issue of drug offense by itself is an Article 6 Non bid in Idem violation even under the Blockburg testing.   Because issues on drug offense is a done deal which had been adjudicated and resolved by U.S. District Judge Emmet Sullivan.   His landmark final disposition of the alleged "drug proceeds" back to their legitimate owner,i.e., this petitioner, after his order of dismissal of the grand jury indictment of drug charges with prejudice,  has not only exonerated the Petitioner with U.S. side drug/drug related charge. But implicitly exonerated any charges implicating *money* laundering addressing "money issues" in U.S. Department of Justice initiated Seizures and Forfeiture. At that point, had Magistrate Judge Faciola not made fatal mistakes/misjudgment in re-adjudicate for double jeopardy the drug and drug related/derived charges on behalf of Mexico to wastefully and imprecisely pierce holes against the integrity of Judge Sullivan's ruling, he should have at least rejected Mexican Authorities' Request for Extradition without prejudice, *and ordering the latter to re-file an amended request for extradition by deleting drug/drug related charges,* and possibly, also deleting money laundering charges, with a commitment letter not to prosecute the Petitioner for these excluded charges in the State of Mexico, in the light of *Brown v. Ohio*, and even arguably applying such fancy interpretation of Article 6 "offense" within the ruling of Blocksburg. Because there is no issues regarding the drug/drug related, drug derived charges, which had been adjudicated, argued, debated and resolved in Judge Sullivan's Court. They should not be allowed to be included in Extradition Request by Mexican Authorities, neither it should be re-prosecuted and re-adjudicated in Mexico according to Article 6 of the Treaty, *Non bis in idem*.

**6.   Due Process under 5th Amendment violations in denying the Petitioner a "full, fair and meaningful hearing" on "sufficiency of evidence" as well as gross and total violations of Article 3 of the U.S.-Mexico bilateral Extradition Treaty;**

New questions arose should the line of "not the same offenses" were presented for U.S. Court to decide their extraditability, after deleting drug/drug related charges.

It appears in the records all such necessary and minimum procedural safeguards in arguing upon "sufficiency" of evidence on other charges were either overshadowed or sidelined by the on-going intensified double jeopardy issues of drug allegations.   The Petitioner's rights under the constitutional safeguard of procedural due process should in no circumstances be denied, therefore, the Petitioner should have been accorded with a fair, full and meaningful hearings of the "not the same offenses" away from what Article 6 barred.

The theme that treaties and other international obligations should not inhibit fundamental individual rights policies of the United States is a powerful one. Cf. *Societe Nationale Industrielle Aerospatiale v. United States District Court, S.D. Iowa*, 482 U.S. 522, 554, 107 S.Ct. 2542, 2550, 96 L.Ed.2d 461 (1987) (treaty interpreted to leave United States rules for discovery in civil cases intact); Henkin, Rights: American and Human, 79 Colum.L.Rev. 405, 411 (1979) (American rights are in some sense supreme because they "antecede the Constitution and are above government"). The inherent conflict between national sovereignty and obligations under treaties which appear to limit that sovereignty is well illustrated by the right of extraditing nations to refuse to violate their own sense of individual justice. See *Barr v. United States Dep't of Justice*, 819 F.2d 25, 27 (2d Cir.1987) (The "treaty may authorize only such governmental action as is in conformity with the Constitution."); *Reid v. Covert*, 354 U.S. 1, 16-18, 77 S.Ct. 1222, 1230-31, 1 L.Ed.2d 1148 (1957) (supremacy of Constitution over particular treaty); L. Henkin, R. Pugh, O. Schachter & H. Schmidt, International Law: Cases Materials 184-85 (2d ed. 1987).

Treaty obligations will sometimes need to be read and interpreted by the courts of a nation in the context of the fundamental law of the nation that entered into them. In the United States that law includes those principles embodied in the due process clauses of the fifth and fourteenth amendments to the Constitution guaranteeing extensive protections to the criminally accused. Cf. L. Henkin, Foreign Affairs and the Constitution 255 (1972) ("In regard to foreign relations … 'due process of law' requires fair procedures for aliens as for citizens … in civil as in criminal proceedings, before administrative bodies and in courts."). This principle, we emphasize, does not require us to impose the details of our Constitution or procedural system on a requesting country's judicial system. See *Neely v. Henkel*, 180 U.S. 109, 122, 21 S.Ct. 302, 306, 45 L.Ed. 448 (1901). **It does entail an obligation not to**

extradite people who face procedures or treatment that "shocks the conscience" of jurists acting under the United States Constitution and within our current legal ethos. See *Rosado v. Civiletti*, 621 F.2d 1179, 1195-96 (2d Cir.), cert. denied, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980) ("Thus, although the Constitution cannot limit the power of a foreign sovereign to prescribe procedures for the trial and punishment of crimes committed within its territory, it does govern the manner in which the United States may join the effort."). Cf. *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

Assuming Mexican Authorities had cleansed its Request for Extradition by deleting all criminal allegations which have been finally disposed by the U.S. District Court, clouds of head-on collision cause violation of *Non bis in idem under Article 6 of the Treaty is still in place*, because *Mr. Velarde's globally pronounced and publicized new version of criminal prosecution based upon the claimed U.S. prosecutors' leakage of Mr. Ye Gon's alleged "admission" during the "interviews" has apparently made potential Mexican criminal prosecutions the same as those have been thrown out from the U.S. District Court. Therefore, Mexican authorities globally publicized new version of prosecution based upon so-called Ye Gon's admission has not only violated Article 6 of the Treaty, it also brutally violated 5th Amendment of the U.S. Constitution, given to Mr. Velarde's official position representing the top authority of the Mexican government. None of these new changes of circumstances had ever been considered by Magistrate Judge Facciola.* **Apparently, Mexican Government's 10/23/2009 conscience shocking propaganda followed with its publicized vows to use such propaganda materials to re-prosecute Ye Gon in Mexico was recklessly escaped scrutiny of Judge Facciola.**

**7.    Intervening Circumstances caused by Incompetent Counsels' "Assistance" Deprived Petitioner's Procedural Safeguards under 5th Amendment, as in Violation of 6th Amendment Found in Mexican Authority's Tampering Evidence, Obstruct of Justice**

Fourth Circuit recently granted relief under Coram Nobis **In United States v. Akinsade,** 686 F.3d 248, **4th Cir, 2012 because the 4th Circuit found** counsel's affirmative misrepresentations rendered his assistance constitutionally deficient under the first prong of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which also reflected the jurisprudence in landmark case Padilla v. Kentucky, *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), a landmark case.

With the most recent landmark case UNITED STATES OF AMERICA v. TEMITOPE AKINSADE, No. 09-7554, decided August 2012, the 4th Circuit granted Petition for *Writ of Coram Nobis*, for incompetent counsel claim.   This instant case has demonstrated that all those built up reversible errors have been root-caused in set of situation of the world's worst, probably the most incompetent, most brainless,

laziest, unethical and stupid counsels causing the outfit probably 100 times more serious than the circumstances in Akinsade's counsel "misgiving advice".

We have long taken it for granted that our judicial systems under the safeguard of constitutional democracy is an integrated framework that none could be successful in derailing it by conspiracy with representatives of a corrupted foreign power. Nevertheless, Petitioner's former "Defense" counsel has rewritten all this by his conscience shocking unethical behavior and practice which has placed the Petitioner in catastrophic peril by crossing all ethical and disciplinary restraints.

To vividly illustrate the deep nature of the abuses of this magnitude, we have to briefly revisit what happened approximately two years prior to Judge Facciola's rendering Certificate of Extraditability in February 2011.

On October 23, 2009, the Associated Press, followed with all major media world over, publicized a shocking break-through, apparently based upon Mexican Deputy Attorney General Leopoldo Velarde Ortiz's press release, forming the Mexican Authority's new version of narcotic drug charge against Ye Gon as follows:

Ye Gon "told U.S. Prosecutors he has sold tons of a chemical used to make methamphetamine on black market," "a top Mexican official told the Associated Press" (AP Exclusive: $205M Man says he sold meth chemical" AP, 10/23/2009)

The worldly circulated breaking news continues: The Mexican prosecutor general's office through its Deputy Attorney General Leopoldo Velarde Ortiz irresponsibly publicizing its accusation through out the world claiming U.S. Law enforcement quoting Ye Gon's *"admission" of "selling" "tons of"" methamphetamine precursors* on the *black market*" (See AP News dated 10/23/2009, As Exhibit #6, emphasis added) .   That Deputy Attorney General attributed their receipt of such information to leak made by U.S. prosecutors, with whom, Mr. Ye Gon had allegedly had "*interviews*" with the "U.S. Authorities, during which "he (Ye Gon) *admitted* his responsibility in the commission of the crimes he was accused of", said Velarde in his news release with the Associated Press. The same group of U.S. prosecutors, apparently from the U.S. DOJ, had "not yet provided transcripts of the *conversation* or specifics of Ye Gon's account", said Mr. Velarde. (Exhibit 6, Emphasis added)

Checking the time sequence, such a "leak" and the underlying story of the leak, true or false, occurred during the period while Mr. Manny Retureta and Mr. Eduardo Balarezo, who were later terminated by Mr. Ye Gon for cause, were Mr. Ye Gon's criminal defense counsel.    Though these former counsels denied the truth of Mexican Deputy Attorney General's Publicity, blaming Mexican authorities attempted to "try the case in the media." *They had never put such Mexican new version of*

*prosecution on the table to fight against, having completely neglected the harmful consequences of such a worldly proclamation of Mexican Government's changed version of aggravated narcotic charges against Mr. Ye Gon in such depraved heart recklessness* given to the fact that **"Mexican prosecutors are hoping Ye Gon's conversations with U.S. prosecutors can be used as evidence in Mexico."** (AP Exclusive: Exhibit 6, page 2) Sucn an inaction makes people to second guess what role did these "defense" counsels do regarding the contents quoted by Mr. Velarde on October 23, 2009. Were they the source of such information or mis-information that fueled the wild fire set out by Mexican top prosecutorial authority in October 2009? We are not here to argue with either Mr. Retureta or Mr. Balarezo whether Deputy Attorney General's public pronouncement was true, neither shall we further explore what role did those two defense counsels had ever played in the footage of what Mr. Velarde told the media world over, the undeniable truth is that, Mr. Returata and Mr. Balarezo knew or should have known that such a worldly pronounced new version of Mexican prosecution, representing the top government authority's publicized official position, true or false, would be definitely and absolutely used by the Mexican prosecutors to prosecute Mr. Ye Gon upon his being extradited. Then, what damage control measures have these defense counsels ever taken to defend their clients under changed circumstances?   If these responsible defense counsels, who claimed, also received, large seven digits fees in total upon Mr. Ye Gon's calculation, interestingly beinbg pre-approved by the USDOJ, before pop-up of the allegations cited in Mr. Velarde's press release, had failed to take any effective aftermath damage control measures in properly response to such a development, the logic question that has to be raised is: "Why not?"

Even though we are not here to raise the question as to what role did these two apparently incompetent defense counsels had played leading to Mexican Deputy Attorney General's belief and utterance before the world media that U.S. Department of Justice enabling the Mexican top authority's public pronouncement that Mr. Ye Gon admitted having sold tons of Meth precursor on black market, they knew or should have known what would be the penal and constitutional consequences while Mexicans had made it clear they would use such information against Ye Gon.   As Mr. Ye Gon's defense counsel, why couldn't they stand up and stand out to tell the world that such Mexican *alleged "admission", "interviews" had never occurred during their tenure as being the criminal defense counsel for Mr. Ye Gon,* **therefore it is simply a lie.** Did they do such a minimum job? None.   Additionally, why did not these counsels present evidence to eliminate harmful impact of such Mexican allegation, by warning Judge Facciola's court in timely fashion that such new version of lie had fundamentally changed Mexico's September 2008 version of Request for Extradition, regarding "new evidence" under Art. 3 of the treaty, having triggered Article 6 impasse and impasse under the 5th Amendment, either acting as criminal defense counsel or as the friends of court. Then, Criminal case 07-181 needs to be reopened for further proceedings.

Misquoting, if misquoting, USDOJ's alleged leaking *confidential* "interviews", if any "interviews", followed with "admission", if any, is one of the most serious abuses and violations in the light of 5th Amendment, why did not those two defense counsels request the U.S. Department of Justice to take any remedial measures to mitigate such adversarial consequences after Ms. Laura Sweeny, the spokesperson for the U.S. Department of Justice, told the Press that the DOJ "had no comment" on Mexican Deputy Attorney General's Press Release.

This undersigned noticed that after Mr. Velarde's public pronouncement, these defense counsel generally denied the truth of such "admission". We hope their answers to the media were truthful given to the apparent collapse of the falsified charging evidence given by Mexican authority to the United States, it appears there was no need for such alleged "interviews", given to the balance of the Defendant's penal interests, even if these counsels have seldom carefully studied  full pictures and details of criminal matters in this case or probably all other cases they have handled, they were then under the obligations to present such a truth to the extradition court to let Judge Facciola know the new version of Mexican accusations were untrue.

 A more severe issue here is that if, assuming arguendo, what Mexican Authorities alleged had been true, Mr. Ye Gon's then counsels would have committed text book mal-practice as incompetent counsels, as pinpointed by the U.S. Supreme Court, in Padilla v. Kentucky, such a pattern of career criminal defense counsel's way of handling the case are barred and punishable, if they had completely ignored the equation that their client's penal interests, positive or negative consequence wise, should be junior to their *paramount* interests in remaining in the United States. Therefore, assuming *arguendo*, these two counsels had really caused such unnecessary "interviews" followed with alleged "admissions" in drug crimes, definitely bringing no penal interests to Ye Gon, they should have been bound to handle the case in completely different way in the light of *Padilla and Akinsade*.

 If Mr. Ye Gon's then defense counsels had failed by both ends, their textbook incompetence has triggered their client's catastrophic besiege now, their incompetence and unprecedented misdeeds may be the basis for granting this Petition in light of United States v. Akinsade, 686 F.3d 248, 4th Cir. 2012

None of a sovereign state shall allow a foreign power to freely abuse the justice syst**em of that civilized nation, much less this world's leading constitutional democracy, criminal defense or extradition proceedings alike.  The 2nd Circuit solemnly held: "…neither can another nation use the courts of our country to obtain power over a fugitive intending to deny that person due process." Should never be tolerated. "We cannot blind ourselves to the foreseeable and probable results of the exercise of our jurisdiction. Cf. Jhirad, 536 F.2d at 485 (requiring demanding state to show that petitioner would not be prosecuted for a crime for which the statute of limitations had run); Gallina v. Fraser, 278 F.2d 77, 79 (2d**

*Cir.), cert. denied, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960) ( "federal court's sense of decency" may limit extradition); In re Extradition of Burt, 737 F.2d 1477, 1486-87 (7th Cir.1984) ("fundamental conceptions of fair play and decency" and "particularly atrocious procedures or punishments" may be considered by the court); Plaster v. United States, 720 F.2d 340, 348, 354 (4th Cir.1983) ("individual constitutional rights" must be weighed to determine if extradition would be "fundamentally unfair"); United States ex rel. Bloomfield v. Gengler, 507 F.2d 925, 928 (2d Cir.1974), cert. denied, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (extradition may be "antipathetic to a federal court's sense of decency").*

In the above-light, this Petition for Writ should be granted and case 08-596 be vacated at least for the sake of counsels' incompetence, among others.

## 8. <u>Subject to Article 3 of the UN Torture Convention, as well as Section 241(a) of the INA, Petitioner should not be Extradited into Mexico, Even Assuming His Eligibility for Asylum was Denied with Exhaustion of Procedures</u>

Corrupted Mexican authorities has been infamous for its widely infected epidemic of tortures.   According to the credible report issued by the Amnesty International, the Nobel Peace Laureate human rights organization, the rates of tortures climbed up 600% during the most recent decade from September 2004 through September 2014. Most part of such increase occurred during the President Felipe Calderon's war on drug period. (Supplemental Exhibit #2, yet to be submitted separately.)

Most fearing development in this instant case is that the similarly situated co-defendants, including the innocent victim recently acquitted such as Mr. Hua Xin Fu,  Yong Qing Ye were brutally, systematically and routinely tortured with all inhumane punishments even involving gay sexual assaults by the beast-like wards. (Supplemental Exhibit #13 and 14, yet to be submitted separately.)

 We have noticed that the torture related issues has been thoroughly discussed in prior arguments.   What needs to be added and made clear in this Section is that regarding the torture issues, the best tribunal to examine, determine and dispose the issues is the U.S. Immigration Court which should be given its priority to determine the matter.

U.S. Courts other than immigration court may from time to time to face and adjudicate the issues in the extradition outfit.   The Torture deters the Court to grant an Extradition Request is seen in the matter of Soering, which "constitutes an important precedent on the refusal to extradite because of anticipated torture, cruel conditions of incarceration or lack of due process at trial in the requesting country. It reflects a persuasive though non-binding international standard. Cf. *Demjanjuk v. Petrovsky*, 776 F.2d 571, 582 (6th Cir.1985), cert. denied, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986) ("The law of the United States includes international law," citing *The Paquete Habana*, <u>175 U.S. 677</u>, 712, 20 S.Ct. 290, 304, 44 L.Ed. 320 (1900)). Cf. United Nations Convention Against Torture and Other Cruel,

Inhuman and Degrading Treatment or Punishment art. 3, GAOR A/39/506 (1984), 23 I.L.M. 1027, 1028 (1984) ("No State Party shall … extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.");

In the contest of torture prevention among other concerns, a denial of extradition request is also based upon concern of "sense of decency", the element was seen derogated given to Mr. Retureta's indecent move or inaction. "federal court's sense of decency" may limit extradition); *In re Extradition of Burt*, 737 F.2d 1477, 1486-87 (7th Cir.1984) ("fundamental conceptions of fair play and decency" and "particularly atrocious procedures or punishments" may be considered by the court); Plaster v. United States, 720 F.2d 340, 348, 354 (4th Cir.1983) ("individual constitutional rights" must be weighed to determine if extradition would be "fundamentally unfair"); *United States ex rel. Bloomfield v. Gengler*, 507 F.2d 925, 928 (2d Cir.1974), cert. denied, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (extradition may be "antipathetic to a federal court's sense of decency").

## 8. The Request for Extradition is Moot Regarding Requesting Party's Redress

Another fatality of this instant case addresses the redressibilty of the Requesting Party regarding ***Article 19, Surrender of Property***. A chaotic consequences will be inevitable should Mexican Authority's request for Extradition be granted under the circumstances.

The records shows that the underlying case had not only resulted in dismissal of criminal prosecution with prejudice in the United States district Court, yet it also resolved by the same U.S. District Court for the final disposition of the Petitioner's seized and forfeited properties, including expensive vehicles, housing, cash, which had been seized and forfeited by the U.S. DOJ as allegedly "drug proceeds".   Article 19 provides that upon granting of extradition by the requested party, properties including objects of value, shall be surrendered to the requesting party, *i.e.*, the State of Mexico. Raising this issue may bring panic to Mr. Ye Gon's such prior counsels as Mr. Retureta and Mr. Balazero, whose incompetence is the critical issues here, while who took the large chunk of the assets under Article 19, ***before*** and after it was ordered to be released.

Article 19 cannot be enforced and implemented without challenging the U.S. District Court's final disposition of the seized initially suspected for being "drug proceeds", certainly a wrongful label, due to the fact that all the properties had been ordered released to the Petitioner and that had been distributed already under the auspices of the Petitioner's prior counsels. The District Judge ordered the final disposition of the property under Article 19 simply because the Authorities of Mexico

had completely failed to present any meaningful charging evidence of probative value in a period of complete two years, according to Judge Sullivan, rather than simply accommodating the USDOJ's giving the Mexico extradition for top priority.   At this point, this whole case should be deemed as completely resolved in the Petitioner's favor.   Therefore, Mexican authority's demand for extradition with its focus upon litigated, adjudicated and disposed issue of proven groundless charge of drugs and moneys should have been properly deemed as moot, period, unless and until such request is completely detached from any drug and money laundering related allegations and sufficiency of the evidence of non-drug offenses passes test of sufficiency under Article 3, through due process attached fair evidentiary hearings, if any, yet to be given. Judge Facciola had apparently recklessly ignored the issues in Art. 19 while granting it, given to the fact that Mexican Government did not revise or amend its extradition request by explicitly waiving its interests under Art. 19.

## 9. <u>Legal Analysis of the Likeliness of the Writ of Coram Nobis Pending USDCDC</u>

The Petition for Writ Coram Nobis was indeed filed under difficult circumstances yet it must be filed in order to have the court on trial level to be aware of such grave errors of fundamental characters. Such an action must overcome procedural impasse if any, given to all other remedies may be too late due to latches.

"Federal courts have the authority to grant relief ……via a writ of error *coram nobis* after the expiration of a sentence." *United States v. Bazuaye*, 2010 WL 4366456, *1 (4th Cir. Oct. 28, 2010) (citing 28 U.S.C. § 1651). "Traditionally, the writ is available only to remedy 'factual errors material to the validity and regularity of the legal proceeding itself.'" *Id.* (quoting *Carlisle v. United States*, 517 U.S. 416, 429 (1996)). "Because the writ is an extraordinary remedy that should issue only under circumstances compelling such action to achieve justice, an error of the most fundamental character must have occurred to warrant issuing the writ, and no other remedy may be available." *Id.* (quotations and internal bracketing omitted).

Federal criminal case today where a writ of *coram nobis* would be necessary or appropriate.'" *Id.* (quoting *Carlisle*, 517 U.S. at 429). In order to obtain a writ of error *coram nobis*, a Petitioner must demonstrate that "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character." *Id.*

The writ "rose phoenix-like from the ashes of American jurisprudence through the benign intervention of the Supreme Court in *United States v. Morgan*, 346 U.S. 507 (1954)." *United States v. Balistrieri*, 606 F.2d 216, 219 (7th Cir. 1979). In *Morgan*, the Court found that although the writ had been abolished in civil cases, it was available in criminal cases when 28 U.S.C. § 2255 was inapplicable. The Court,

however, did not clearly announce which rules of procedure should govern *coram nobis* proceedings. The Court found that a writ of *coram nobis* "is a step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a civil proceeding." *Morgan*, 346 U.S. at 506, n.4. The Court maintained that "[w]hile at common law the writ of error *coram nobis* was issued out of chancery like other writs . . . the procedure by motion in the case is now the accepted American practice." *Id.* The Court found that a motion for the writ "is of the same general character as one under 28 U.S.C. § 2255." *Id.* This language has led to disagreement among the Circuit Courts as to whether the civil rules or the Rules Governing § 2255 Proceedings should be applied for, among other things, obtaining discovery.

Though the U.S. Department of Justice normally argues that "extraditions are their own category of case: they are neither criminal nor civil cases, although many concepts from criminal law apply in extradition proceedings. (614 of USDOJ Manual: Procedures in the US district Court), However, the issues at the heart of the case argued, adjudicated are those in criminal nature: drug offense, money laundering, etc.

Although "a *coram nobis* motion is a step in a criminal proceeding, [it] is, at the same time, civil in nature and subject to the civil rules of procedure." *United States v. Balistrieri*, 606 F.2d 221, also see 216, 219 (7th Cir. 1979); *see also Trenkler v. United States*, 536 F.3d 85 (1st Cir. 2008); *United States v. Johnson*, 237 F.3d 751 (6th Cir. 2001). *see also Trenkler*, 536 F.3d at 94 ("Given the lessons of history, we are convinced that *coram nobis* proceedings are best seen as hybrids—quasi-civil and quasi-criminal. On this view, the denomination of the nature of a given petition calls for a functional analysis rather than for doctrinal rigidity."). The Seventh Circuit maintains that §2255 rules are "highly persuasive in deciding how *coram nobis* motions should be conducted." *Balistrieri*, 606 F.2d at 221.

Through extensive "re-litigating" what was dismissed by Judge Emmet Sullivan in August 2009, "drug" related crime and properly having disposed Petitioner's "money", subject of any "money laundering" charges anywhere, being seized and forfeited by the USDOJ, Magistrate Judge John Facciola had nevertheless found Mr. Ye Gon was "guilty" of Mexican authority's charges of "drug", money laundering, and other felony offenses by "probable cause" in February 2011.   It is obvious that the underlying case is a criminal in nature. Additionally, Mr. Ye Gon's detention status, and any legal basis in support of his detention, after his criminal prosecution was dismissed and seized properties were released to him remains unclear. Whether or not Mr. Ye Gon is free from "false imprisonment", such a fact does not take place within the jurisdiction of DC, this Court should not put such a "false imprisonment" anywhere except DC into account.   If the issue must be raised, the USDOJ should be accountable to answer.

Grant of Petition for Writ of Coram Nobit "has also demonstrated that he has suffered a fundamental error necessitating coram nobis relief. See Kwan, 407 F.3d at

1014 (ineffective assistance of counsel is a fundamental error); United States v. Castro, 26 F.3d 557, 559 (5th Cir.1994) (same)

**In United States v. Akinsade, this Judicial Circuit held:**

**"In granting of such extraordinary writ in incompetent counsel situation, "…we must consider whether counsel's misadvice is an error of the "most fundamental character" such that coram nobis relief is required to "achieve justice." Denedo, 129 S.Ct. at 2220. To determine this, we examine the merits of Akinsade's ineffective assistance of counsel claim to decide whether Akinsade has been prejudiced. See Mandel, 862 F.2d at 1074–75."**

**"When, as here, the claim raised is that of ineffective assistance of counsel, the overall focus must be on the prejudice arising from counsel's deficient performance. If a district court's admonishment so happens to correct the deficient performance then there is no prejudice; however, if there is no correction, then our scrutiny is not directed toward the district court but appropriately to the constitutional offender." Mr. Retureta's unethical move against Petitioner's fundamental rights to life, liberty and property is a textbook constitutional offender.**   (See Exhibit #5A in Group Exhibit #2) **See O'Dell v. Netherland, 95 F.3d 1214 (4th Cir.1996) (en banc).**

## 10. <u>Relief Prayed:</u>

Despite the fact that the executive branch has a constitutional duty and right to conduct foreign policy, and the legislative and executive branches together have the duty and right to enter into treaties for extradition, the courts are not, and cannot be, a rubber stamp for the other branches of government in the exercise of extradition jurisdiction.Wherefore, in the foregoing light, Petitioner respectfully prays that this Petition for a stay for an indefinite period of time, pending final solutions and disposition of all related pending cases be granted, given to the likeliness that the U.S. District Court's Decision of Denial of Petitioner's Petition for Writ of Habeas Corpus be reversed and remanded.

Petitioner respectfully prays that the following relief:

1. Grant this Petition for Writ Coram Nobis and Vacate Judge Facciola's 02/09/2011 Order, with or without prejudice
2. To set aside 02/09/2011 Order on case 08-596 for further proceedings; Or alternatively, suspend Judge Facciola's 02/09/2011 Order for further investigation allowing limited discovery to investigate the most serious violations, abuses, and misdeeds;
3. If so, order to have all parties to conduct limited discovery regarding the newly discovered evidence and shocking revelation of incompetent attorney's abuse of the

proceedings Trenkler v. United States, 536 F.3d 85 (1st Cir. 2008); United States v. Johnson, 237 F.3d 751 (6th Cir. 2001);

4.To immediately order an stay of the USDOS recently issued extradition order to allow this Petition be adjudicated;

5. To immediately order an stay of the USDOS recently issued extradition order to allow the U.S. Immigration Court to Decide such Article 5 matter under the U.S. Mexico Extradition Treaty;

6. Due to the fact that petitioner filed with the USDOS a request for Review, this Court is prayed to order an stay of the USDOS recently issued extradition order to allow the USDOS time to take administrative measures to correct its own mistakes;

7. Such other relief as this Court deems it necessary and appropriate.

With this Amended Petition, which has carefully deleted all the ultra-sensitive wordings from the original soft version, this petitioner filing this Supplemental Motion for Stay will not seek for its being processed under seal. The related prior filing under seal is therefore be withdrawn.

Due to the fact that this case involves numerous complicated legal issues of all aspects, Petitioner prays for an **Oral Argument session** should such a prayer may please this Hon. Court for the interests of justice.

Respectfully submitted by,


/s/Ning Ye, Esq.
3626A Union Street, Suite 3F
Flushing, NY 11354
Tel.: (718)308-6626 (24 hrs); (718) 321-0818 (Office)
Fax: (718) 228-5816   Email:   ynyale@aol.com
Counsel for Petitioner Zhenli Ye Gon

Certificate of Service:

This undersigned hereby certified that a copy of the above-petition has been served upon all the participating parties including the Respondents via this Hon. Court's ECF Electronic Broadcasting system (as well as via USPS Priority Mail, in a sealed envelope, postage prepaid, to the requested addressees according to the related Summons to respective Respondent via counsels, among them, the following designated recipient, on this 10th day of November, 2015:

Valinda Jones. Esq.
Counsels for the Respondents
U.S. Department of Justice
Office of International Affairs
1301 New York Avenue, NW
Bond Building
Washington, DC 20530
Tel.: (202）616-5193
Fax: (202) 514-6112

_____

/s/Ning Ye